MACMILLAN, INC., Plaintiff,

v.

AMERICAN EXPRESS COMPANY; Shearson Lehman Hutton Holding, Inc.; and Shearson Lehman Hutton, Inc., Defendants.

No. 88 Civ. 4702 (RWS).

United States District Court, S.D. New York.

April 6, 1989.

Kirkpatrick & Lockhart, Pittsburgh, Pa. (David A. Brownlee and Jerry S. McDevitt, of counsel), and Macmillan, Inc., Legal Dept., New York City (Jan Constantine, of counsel), for plaintiff.

Willkie Farr & Gallagher, New York City (Anthony F. Phillips, Deborah E. Cooper, Mitchell J. Auslander, Elizabeth S. Stong and Douglas Young Peters, of counsel), for defendants.

## OPINION

SWEET, District Judge.

Defendants American Express ("American Express"), Shearson Lehman Hutton Holdings Inc. ("SLH Holdings"), and Shearson Lehman Hutton Inc. ("Shearson") (collectively, the "Shearson defendants") have moved pursuant to Rule 11, Fed.R. Civ.P., for sanctions against plaintiff Macmillan, Inc. ("Macmillan") and its counsel, the Pittsburgh law firm of Kirkpatrick & Lockhart ("Kirkpatrick") and Jan Constantine ("Constantine") of Macmillan's legal department. For the reasons set forth below, the motion is denied.

### The Control Contest

Beginning in June 1987, various entities controlled by Robert M. Bass ("Bass") (collectively, the "Bass Group") began accumulating Macmillan shares. The following year, on May 17, 1988, the Bass Group delivered a letter to Macmillan indicating its desire to buy Macmillan's outstanding stock at $64 per share.

Macmillan rejected the Bass Group's proposal and two weeks later announced a restructuring plan that it valued at $64 per share. In response, the Bass Group on June 4 increased its offer to $73 per share and two days later filed an action in Delaware Chancery Court to enjoin Macmillan's restructuring plan. On July 14, 1988, the Delaware Chancery Court preliminarily enjoined Macmillan's proposed restructuring. *See Robert M. Bass Group, Inc. v. Evans*, 552 A.2d 1227, [Current] Fed.Sec.L.Rep. (CCH) ¶ 93,924 (Del.Ch.1988), *appeal dismissed and remanded on other grounds sub nom., Macmillan, Inc. v. Robert M. Bass Group, Inc.*, 548 A.2d 498 (Del.Sup. Ct.1988).

On July 18, 1988, the Bass Group launched a $75 per share tender offer for all outstanding shares of Macmillan stock. Almost a month later, on August 15, Robert Maxwell of Maxwell Communication Corp. PLC ("Maxwell"), through Mills Acquisition Co., entered the fray, offering $80 per share for Macmillan's outstanding stock.

On September 12, 1988, Macmillan's directors decided the company should be sold and abandoned the company's restructuring plan. When Maxwell increased its offer to $86.80 per share on September 16, 1988, the Bass Group withdrew its $75 per share offer. Maxwell ultimately acquired Macmillan.

### Prior Proceedings

This suit arose out of the above described control contest. In response to the Bass Group's accumulation of Macmillan shares, Macmillan—through its counsel Weil, Gotshal and Manges ("Weil Gotshal") —sued the Bass Group. Macmillan also retained Kirkpatrick to investigate the possibility of suing other entities that it believed were participating in the Bass Group's attempt to acquire Macmillan, including the Shearson defendants as participants in Acadia Partners L.P. ("Acadia").

During June 1988, Kirkpatrick investigated possible claims against the Shearson defendants. The firm's attorneys met with Macmillan representatives, reviewed and analyzed hundreds of documents, and conducted legal research. In addition, Kirkpatrick retained a former specialist with the New York Stock Exchange ("NYSE") to analyze trading patterns in Macmillan's stock.

On July 7, 1988, Macmillan sued the Shearson defendants in this action to enjoin the Bass Group's tender offer, alleging that the Shearson defendants were part of a section 13(d) group with the Bass Group and others and that the Shearson defendants had violated Rule 10b-13. That same day, Weil Gotshal amended the complaint in the *Bass* action to allege section 13(d) violations.

When the Bass Group terminated its tender offer on September 16, 1988, this action became moot and was dismissed on October 23, 1988, subject to reopening in thirty days. The Shearson defendants have moved to reopen the case to impose sanctions under Fed.R.Civ.P. 11 against Macmillan and its counsel for filing a complaint they claim was not well-grounded in fact or warranted by existing law.

**74**

*Rule 11 Sanctions*

### 1. Applicable Legal Standards

█ Rule 11 provides:

The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Fed.R.Civ.P. 11. In applying Rule 11, courts must assess whether an attorney's conduct was objectively reasonable as of the time he or she signed the pleading, motion, or other paper. *See Calloway v. Marvel Entertainment Group*, 854 F.2d 1452, 1469–70 (2d Cir.1988), *cert. granted,* — U.S. ——, 109 S.Ct. 1116, 103 L.Ed.2d 179 (1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 253–54 (2d Cir.1985), *cert. denied,* — U.S. ——, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987); *Oliveri v. Thompson*, 803 F.2d 1265, 1274–75 (2d Cir. 1986), *cert. denied*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). Courts should resolve all doubts and draw all inferences in favor of the signer. *See Riis v. Manufacturers Hanover Trust Co.*, 632 F.Supp. 1098, 1106 (S.D.N.Y.1986); *see also Eastway*, 762 F.2d at 254. Where a court finds a Rule 11 violation, sanctions are mandatory. *See Eastway*, 762 F.2d at 254 n. 7.

### 2. Not Well–Grounded in Fact

█ The Shearson defendants charge that Macmillan's complaint contained two allegations that were not well-grounded in fact: 1) that Shearson did not have a Chinese Wall policy and 2) that the Shearson defendants engaged in stock parking. The Second Circuit recently articulated Rule 11's standard governing factual claims:

In considering sanctions regarding a factual claim, the initial focus of the district court should be on whether an objective-ly reasonable evidentiary basis for the claim was demonstrated in pretrial proceedings or at trial. Where such a basis was shown, no inquiry into the adequacy of the attorney's pre-filing investigation is necessary. If no reasonable evidentiary basis for a factual claim was disclosed in pretrial proceedings or at trial, the district court must then scrutinize the objective reasonableness of the attorney's pre-filing inquiry and the basis for the claim developed by that inquiry. If the inquiry was objectively reasonable under the circumstances and disclosed a reasonable factual basis for the claim, then sanctions are not appropriate. On the other hand, if the attorney either failed to make an objectively reasonable inquiry or pursued a claim for which no basis was disclosed by such an inquiry, then sanctions are appropriate.

*Calloway v. Marvel Entertainment Group*, 854 F.2d 1452, 1470 (2d Cir.1988), *cert. granted,* — U.S. ——, 109 S.Ct. 1116, 103 L.Ed.2d 179 (1989). Because this case became moot before any pre-trial proceedings transpired, the second part of this standard applies here. As set forth below, Rule 11 sanctions are inappropriate because Macmillan's counsel conducted a reasonable pre-filing investigation under the circumstances and had a reasonable basis for the factual claims it asserted.

#### a. Shearson's Chinese Wall

Paragraph 25 of the complaint states:

Unlike other multi-service firms, Shearson Lehman does *not* have a Chinese Wall policy that prevents the exchange of material non-public information within or among its various operating groups. As a result, there are no effective institutional safeguards against the misuse of material non-public information by the various operating groups within Shearson Lehman.

The Shearson defendants claim that Shearson set forth its Chinese Wall policy in a November 7, 1986 memorandum that Kirkland possessed at the time it filed the complaint. The November 7 memorandum provided in pertinent part:

THE BASIC PRINCIPLE IS THAT CONFIDENTIAL INFORMATION IS NOT TO BE ABUSED. AN INVESTMENT BANKER WHO POSSESSES ANY NON–PUBLIC INFORMATION, WHETHER MATERIAL OR NOT, WHETHER ABOUT A CLIENT OR ITS SECURITIES OR ABOUT SOME OTHER COMPANY WITH WHICH A CLIENT PROPOSES TO ENGAGE IN A TRANSACTION, MUST NOT TRADE IN ANY OF THE AFFECTED SECURITIES OR REVEAL THE INFORMATION TO OTHERS WHO DO NOT HAVE A LEGITIMATE NEED TO KNOW.

\* \* \* \* \* \*

The Chinese Wall is a specific application of the "need to know" policy. Our Chinese Wall policy may be summarized as follows:

Investment banking personnel may not discuss information concerning corporate clients with registered representatives, traders, research analysts or investment advisory personnel. Such other [Shearson] employees are not permitted to use the Investment Banking Department as a source of any information about public companies.

Because Kirkpatrick reviewed the November 7 memorandum prior to filing the complaint, the Shearson defendants argue that Macmillan violated Rule 11 by alleging that Shearson had no Chinese Wall policy. However, Macmillan had reason to believe when it filed the complaint that the November 7 memorandum did not constitute a Chinese Wall policy.

Prior to its involvement in this case, Kirkpatrick had represented Koppers Company, Inc. ("Koppers") from March until May 1988 in litigation arising out of Shearson's equity investment in a hostile tender offer for Koppers. Responding to Kirkpatrick's request in that case for a copy of Shearson's Chinese Wall Policy, Willkie Farr & Gallagher ("Willkie Farr")—who also represents the Shearson defendants here—sent Kirkpatrick a letter dated May 5, 1988, stating: "Enclosed as you requested is the written statement of Shearson's policies and procedures, including the 'Chinese Wall' policy...." Attached to this letter was the November 7 memorandum.

Notwithstanding the statement in Willkie Farr's cover letter, Kirkpatrick concluded that the November 7 memorandum itself did not represent Shearson's Chinese Wall policy. The paragraphs quoted above from the November 7 memorandum were preceded by the statement: "Our Chinese Wall policy may be *summarized* as follows...." (Emphasis added). At an asterisk, the memorandum noted: "For a detailed explanation of the Firm's Chinese Wall and Restricted List Policy, please refer to a memorandum to be distributed to each of you *shortly.*" (Emphasis added).

Upon receiving the May 5, 1988 letter, Kirkpatrick telephoned Willkie Farr to request a copy of the document containing the detailed explanation to which the November 7 memorandum referred. During that conversation, Willkie Farr stated that Shearson had not circulated that document before March 3, 1988 (the day the Koppers tender offer had been announced) and required that further requests relating to Shearson's Chinese Wall policy be in writing.

Accordingly, on May 6, 1988, Kirkland sent Willkie Farr a letter confirming the telephone call and requesting 1) the document from which the November 7 summary was derived and 2) any detailed Chinese Wall policy Shearson had circulated after March 3, 1988. Kirkland received no response to this request. Shearson in fact circulated its detailed Chinese Wall policy on May 3, 1988, but Kirkland did not learn of this until after it had filed the complaint in this action.

Kirkland's telephone call and letter responding to Willkie Farr's May 5, 1988 letter enclosing the November 7 memorandum demonstrates that Kirkland did not believe the November 7 memorandum constituted a Chinese Wall policy. Moreover, it reflects a reasonable effort to obtain any existing policy. In light of the fact that Willkie Farr failed to respond to Kirkland's May 6, 1988 letter, Kirkland reasonably

could conclude that Shearson had no policy "summarized" in the November 7 memorandum and that the company never subsequently prepared a "detailed explanation." Accordingly, Rule 11 sanctions are unwarranted.

### b. The Stock Parking Allegations

In the complaint, Macmillan alleged that the Shearson defendants were partners in Acadia, a limited partnership whose other limited partners included Bass and senior executives of the Bass Group, among others. Acadia's partners allegedly cooperated as a group (the "Acadia Group"), as indicated by a memorandum Shearson prepared to attract new partners to Acadia:

> All of the partners will have the opportunity to have an active and collaborative relationship that should extend beyond the direct economic return to be derived from the Partnership.

In the complaint, Macmillan contended that the Acadia Group's business involved the "aggressive origination of transactions" with "the singular goal of changing corporate control for its own interests." By doing so, it charged, the Acadia Group could "produce high-yield debt instruments with attached equity components," break up the target companies, or extract "sweetheart deals" from target management. In particular, the complaint alleged:

> By combining their respective businesses, the members of the Group act in concert with other partners or investors in Acadia and other parties to (1) identify undervalued companies; (2) purchase the shares of the target company in concerted but undisclosed fashion; (3) capitalize on material non-public information by placing the stock of the target company in various accounts over which American Express and Shearson have unfettered and complete investment discretion in the form of a parking arrangement; (4) utilize the funds of clients of American Express and Shearson to support their efforts without compensating their clients for the use of their money; (5) demand that the target provide special concessions to the Group; (6) finance the acquisition of the target company; and/or (7) place the stock of the acquired company and/or the lucrative debentures used to finance the transaction in the hands of a few favored investors.

The complaint described the Shearson defendants' role in this *"modus operandi"* as using its access to nonpublic information and control over customer accounts to accumulate target company shares secretly in "friendly" hands in the form of a "parking arrangement." This allegedly enabled the Acadia Group to buy a substantial volume of shares without the required public disclosure before formally announcing a tender offer and to continue buying stock after announcing the tender offer.

According to the complaint, the Acadia Group's scheme included an effort to seize control of Macmillan. Toward this end, Macmillan maintains, the Bass Group began accumulating Macmillan stock in June 1987, acquiring 2,180,600 shares, or 8.8%, by December 1, 1987 and 2,385,238 shares, or 9.1%, by May 17, 1988.

The Shearson defendants' involvement in the Macmillan tender offer allegedly included the following:

> 62. In or around the same time as the Bass entities began purchasing Macmillan stock, Shearson also began an aggressive program to acquire Macmillan stock. Between May 22, 1987 and August 7, 1987, Shearson increased its position in Macmillan stock from 261,113 shares to 810,402. On information and belief, Macmillan avers that substantial amounts of the foregoing purchases were made through client accounts for which Shearson had investment discretion.

> 67. At all times since Bass began accumulating Macmillan stock, various other entities under the American Express/Shearson umbrella held significant positions in Macmillan stocks....

> 68. Additionally, as of March 31, 1988, substantial blocks of Macmillan shares were held in mutual funds operated by investment companies controlled by American Express or Shearson.

93. On information and belief, ... American Express and Shearson have continued to trade in Macmillan stock since May 17, 1988, June 4, 1988 and June 23, 1988 [the dates on which the Bass group allegedly contacted Macmillan about a tender offer].

In short, Macmillan alleged, the Shearson defendants secretly were accumulating Macmillan shares in friendly hands to facilitate the Bass Group's tender offer. The Shearson defendants charge that these allegations violate Rule 11 because Macmillan and its counsel knew facts at the time they filed the complaint that contradict these allegations. However, in light of the information available to Macmillan and the inferences it drew from that information, Rule 11 sanctions are unwarranted.

*Shearson's Decreased Macmillan Holdings.* The Shearson defendants contend that Shearson's trading in Macmillan stock differed from that of other Acadia Group members and contradicted Macmillan's claim that Shearson was accumulating Macmillan stock in friendly hands to facilitate the Bass Group's takeover. While the Macmillan holdings of the Bass Group and other defendants in the *Bass* case increased by 1,817,513 shares to a closing position of 2,393,813 shares from August 31, 1987 through May 31, 1988, Shearson's Macmillan holdings decreased by 135,501 shares to a closing position of 647,027 shares during the same period.

Macmillan appears to have known that Shearson had sold seventeen percent of its Macmillan stock because Macmillan monitored transactions in its stock by the Bass Group, Shearson, other brokers, and institutional investors from May 19, 1987 through May 31, 1988. Moreover, documents in Macmillan's possession at the time it filed the complaint indicate that the company knew of these decreases. However, Macmillan declined to alter its theory in light of this fact, suggesting instead that Shearson may have sold the stock to take profits.

Taking profits during this stage of the alleged stock parking scheme seems contra-indicative, but Macmillan should not be sanctioned for its failure to give the stock sales a determinative effect. Macmillan had documents detailing Shearson's role in the Acadia Group and knew that Shearson continued to hold a substantial block of Macmillan stock and that other Acadia Group members continued to increase their Macmillan holdings. There is no evidence that Macmillan acted in bad faith in discounting the significance of Shearson's sale of Macmillan stock.

*The King Report.* The Shearson defendants also assert that Macmillan knew when it filed the complaint that Shearson's transactions in Macmillan stock were not improper, yet it charged Shearson with using its control over retail accounts to trade on nonpublic information. Macmillan retained D.F. King & Co. ("King") to prepare a "Stock Watch" analysis of transactions in Macmillan's stock. For the May 1987 to August 1987 period when the complaint alleges that Shearson was acquiring Macmillan stock improperly, King advised Macmillan that the positions held at Shearson were widely dispersed among Shearson retail customer accounts and were not a "problem spot."

However, Macmillan's failure to alter its theory in light of the King report does not warrant Rule 11 sanctions. Kirkland disregarded the report because it believed King was unaware of Shearson's involvement in the Acadia Group when King conducted his stock watch. More importantly, in preparing the complaint Kirkland retained a NYSE specialist who analyzed Shearson's block trading and concluded, contrary to King's view, that Shearson was involved in sizeable block transactions that were not typical of retail accounts.

*Takeover Speculation.* Macmillan was widely regarded as a likely takeover target during 1987 and 1988, and Shearson alleges that Macmillan knew that takeover rumors explained the increased price and volume in its shares, rather than improper trading on nonpublic information regarding the Bass Group's intentions. Charles G. McCurdy ("McCurdy"), Macmillan's Vice President of Corporate Finance, testified at his deposition that takeovers of two publishing

companies in the spring of 1987 generated "a great amount of speculation surround[ing] all publishing companies, including Macmillan." Internal Macmillan memoranda indicate that senior executives regularly monitored the trading volume in Macmillan stock and attributed the increases to speculation in the investment community. Macmillan's investment banker, First Boston, was maintaining a "Strong Buy" recommendation regarding Macmillan shares during the time Shearson was accumulating Macmillan stock. Articles in the financial press between May 1987 and August 1987, some of which Macmillan produced in this lawsuit, reported that takeover speculation focused on Macmillan in mid-May 1987 when Robert Maxwell announced his bid for Harcourt Brace Jovanovich, Inc.

However, Macmillan assessed the evidence available and drew different inferences. At the time it filed the complaint, Macmillan possessed documents indicating that the Shearson defendants were partners in Acadia, a partnership that described its purpose as the "aggressive origination" of transactions designed to change corporate control and that promised an "active and collaborative" relationship between partners. Macmillan also believed that Shearson—as a participant in Acadia—had information regarding the Bass Group's interest in Macmillan and that the firm's lack of a Chinese Wall policy enabled it to trade on this information. The fact that other Acadia partners steadily had increased their Macmillan holdings through the first quarter of 1988 and that Shearson had acquired a substantial volume of Macmillan stock appeared to confirm Macmillan's inferences regarding the Acadia Group, as did the findings of the NYSE specialist Macmillan retained.

### 3. Not Warranted By Existing Law

The Shearson defendants also seek Rule 11 sanctions for the complaint's alleged legal insufficiency regarding its section 13(d) and Rule 10B–13 claims. The Second Circuit has ruled that a court should sanction a party for legally insufficient pleadings only "[w]here it is patently clear that a claim has absolutely no chance of success

under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands. . . ." *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 254 (2d Cir.1985), *cert. denied,* — U.S. —, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). Applying that standard here, Rule 11 sanctions are unwarranted.

### a. Group Membership Under Section 13(d)

■ The Shearson defendants contend that, under "the well-established law of this Circuit," only a beneficial owner of a company's shares can be a member of a section 13(d) group. Because Macmillan knew at the time it charged American Express with violating section 13(d) that American Express owned no Macmillan shares, the Shearson defendants argue, Rule 11 sanctions are appropriate.

Two district courts in this Circuit have ruled that only beneficial owners of a company's stock are part of a section 13(d) group, *see Management Assistance Inc. v. Edelman,* 584 F.Supp. 1016, 1019 (S.D.N.Y. 1984); *Transcon Lines v. A.G. Becker, Inc.,* 470 F.Supp. 356, 373 (S.D.N.Y.1979), but the Court of Appeals has yet to address this issue. As the Second Circuit has noted "a district court decision does not 'clearly establish' the law even of its own circuit. . . ." *Hawkins v. Steingut,* 829 F.2d 317, 321 (2d Cir.1987). Asserting a claim that another district court has denied, therefore, does not demand Rule 11 sanctions. *See Zaldivar v. City of Los Angeles,* 780 F.2d 823 (9th Cir.1986).

### b. Failure to Comply With Pleading Requirements

■ The Shearson defendants also seek Rule 11 sanctions for Macmillan's purported failure to allege that the group members agreed, at a specific point in time, to act together for the common purpose of acquiring, holding, or disposing of Macmillan shares and for its alleged failure to satisfy Rule 9(b)'s particularity requirements. Even assuming Macmillan's complaint in

fact fell short of the pleading requirements governing section 13(d) claims, that alone would not support Rule 11 sanctions. Rule 11 requires conduct more egregious than failure to comply with technical pleading requirements.

### c. The Rule 10b–13 Claims

Macmillan's complaint charges the Shearson defendants with violating Rule 10b–13, 17 C.F.R. § 240.10b–13 (1986). The Shearson defendants seek Rule 11 sanctions, arguing that a reasonable investigation prior to filing the complaint would have disclosed that a Rule 10b–13 claim had "absolutely no chance of success" in this case because Macmillan lacked standing, there is no private cause of action under Rule 10b–13, and the Shearson defendants are not "offerors" for purposes of Rule 10b–13.

> Rule 10b–13 provides in pertinent part: No person who makes a cash tender offer ... for any equity security shall, directly or indirectly, purchase, or make any arrangement to purchase, any such security ... otherwise than pursuant such tender offer....

The rule applies to two groups: 1) shareholders who tender their shares in response to the original tender offer who cannot withdraw their shares to respond to a higher price and 2) tender offerors who might otherwise fall prey to substantial shareholders demanding a higher price than that available to the public investors. *See Beaumont v. American Can Co.*, 797 F.2d 79, 84 (2d Cir.1986); *Field v. Trump*, 661 F.Supp. 529, 533 (S.D.N.Y.1987).

■ *Standing.* The Shearson defendants contend that Macmillan lacked standing to sue because only parties who have tendered their shares pursuant to a tender offer can assert Rule 10b–13 claims. *See Beaumont v. American Can Co.*, 797 F.2d 79, 84 (2d Cir.1986); *see also Priddy v. Edelman*, 679 F.Supp. 1425, 1432–33 (E.D. Mich.1988) ("inasmuch as plaintiff has never claimed that he tendered his shares into any tender offer, the law under Rule 10b–13 is settled that he has no standing").

Although standing for shareholders seeking damages under Rule 10b–13 appears "settled" in this Circuit, courts have yet to consider whether a target company can sue for injunctive relief under the rule. In light of the fact that courts have permitted targets to sue for injunctions to enforce other Williams Act provisions, *see, e.g., Dan River, Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1222–24 (4th Cir.1980), *cert. denied*, 449 U.S. 1101, 101 S.Ct. 896, 66 L.Ed.2d 827 (1981); *GAF Corp. v. Milstein*, 453 F.2d 709 (2d Cir.1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972); *Burlington Indus., Inc. v. Edelman*, 666 F.Supp. 799, 813 (M.D.N.C.1987), Macmillan's Rule 10b–13 claim in this action constitutes a "reasonable argument ... to extend, modify or reverse the law as it stands." *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir. 1985), *cert. denied*, — U.S. —, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). Accordingly, Rule 11 sanctions are not justified.

■ *"Person."* Rule 10b–13 applies to any "person who makes a cash offer." Here, the Shearson defendants contend that this definition includes the Bass Group, but not them. However, courts have yet to consider whether a section 13(d) group constitutes an "offeror" for Rule 10b–13 purposes. Because this remains an open issue and because Macmillan had reason to believe the Shearson defendants and the Bass Group were part of a section 13(d) group, it cannot be said that Macmillan's Rule 10b–13 claim had "absolutely no chance of success under the existing precedents." *Id.*

■ *Private Right of Action.* The Shearson defendants also characterize Macmillan's Rule 10b–13 claim as frivolous because the Second Circuit has "expressed serious doubt that an implied right of action ... exists" under that rule. Defs. Br. at 33. However, the Second Circuit has yet to address this issue squarely. *See, e.g., Field v. Trump*, 850 F.2d 938, [Current] Fed.Sec.L.Rep. (CCH) ¶ 93,905, at 90,037 n. 3 (2d Cir.1988) ("Because full relief is available to plaintiff under Section 14(d)(7), we need not address the claim asserted under Rule 10b–13"); *Beaumont v. American*

*Can Co.*, 797 F.2d 79, 84 (2d Cir.1986); *Pryor v. U.S. Steel Corp.*, 794 F.2d 52, 53 (2d Cir.1986), *cert. denied*, 479 U.S. 954, 107 S.Ct. 445, 93 L.Ed.2d 393 (1986) ("Because full relief is available under ... Section [14(d)(6) ], we need not decide the claim asserted under Rule 10b–13"). Accordingly, Rule 11 sanctions for a private cause of action under Rule 10b–13 claim are unwarranted.

### Conclusion

Rule 11 sanctions are very serious, and courts should not impose them lightly. Because this case became moot before either party made a substantive motion, there was no opportunity for "an objectively reasonable basis for the claim [to be] demonstrated in pretrial proceedings or at trial." *Calloway v. Marvel Entertainment Group*, 854 F.2d 1452, 1470 (2d Cir.1988), *cert. granted*, — U.S. —, 109 S.Ct. 1116, 103 L.Ed.2d 179 (1989). Accordingly, this court's role in deciding the Rule 11 motion required it to "scrutinize the objective reasonableness of the attorney's pre-filing inquiry and the basis for the claim developed by that inquiry." *Id.* In light of the pre-filing inquiry Macmillan's counsel undertook, the facts available to it, and the inferences it drew from those facts, the Chinese Wall and stock parking allegations, as well as the legal claims Macmillan stated, were objectively reasonable.

For the reasons set forth above, the Shearson defendants' motion to sanction Macmillan and its counsel under Rule 11 is denied.

It is so ordered.