SIMON DeBARTOLO GROUP,
L.P., Plaintiff,

v.

THE RICHARD E. JACOBS GROUP,
INC., et al., Defendants.

No. 97 CIV. 6601(MP).

United States District Court,
S.D. New York.

Dec. 12, 1997.

Gordon Altman Butowsky, Weitzen Shalov & Wein (Theodore Altman, Lawrence J. Zweifach, Samuel L. Barkin, of counsel), New York, NY, for Plaintiff.

**428**

Thompson Hine & Flory, LLP, (David J. Hooker, Daniel R. Warren, Luke L. Dauchot, Brian J. Lamb, of counsel), the Richard E. Jacobs Group, Inc. Cleveland, OH, for Defendant the Richard E. Jacobs Group, Inc.

Goulston & Storrs, P.C., (Rudolph F. Pierce, Leonard H. Freiman, Martin M. Fantozzi, Matthew J. O'Connor, Paul M. Cinino, of counsel), Boston, MA, for Defendant New England Development, Inc.

Gould & Wilkie, (John E. Gould, Michael R. Manley, of counsel), New York, NY, for Both Defendants.

## OPINION

MILTON POLLACK, Senior District Judge.

The defendants, New England Development, Inc. and The Richard E. Jacobs Group, Inc. (collectively, "the Defendants") have applied for findings herein under Section 21D(c) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u–4(c), that plaintiff, Simon DeBartolo Group, L.P. ("SDG"), and/or its counsel, Gordon Altman Butowsky Weitzen Shalov & Wein ("Gordon Altman"), should be assessed sanctions for violating Fed.R.Civ.P. 11(b). For the reasons set forth below, sanctions are jointly and severally assessed against SDG and Gordon Altman for violations of Rule 11.

### Background

Both SDG and the Defendants are large owners and developers of shopping centers and other real estate assets. During the spring and summer of 1997, the Defendants negotiated privately with the Real Property Trust ("RPT"), a privately held Massachusetts real estate investment trust, about a possible merger of their respective shopping center businesses. RPT's sole asset is a general partnership interest in Shopping Center Associates, which owns and develops shopping centers worth more than $1 billion. RPT has approximately 129 shareholders, and its shares are not registered.

The proposed merger, dubbed "Project Grand Slam," would have resulted in a new, publicly held real estate investment trust.

RPT's board of trustees retained Lazard Frères & Company ("Lazard") to analyze Project Grand Slam and to report to RPT's shareholders on its worthiness. Lazard held informational meetings regarding Project Grand Slam for RPT shareholders in May, June and July, 1997. At the July meeting, Lazard estimated that the value of the RPT stock under the Project Grand Slam proposal would be $18.43 per share. SDG, as one of RPT's shareholders, received this information in regular course.

During July and August, 1997 both SDG and the Defendants purchased RPT's stock from several of the company's large institutional shareholders. SDG purchased approximately 6% of the capital stock during this time period; the Defendants acquired 24%.

Following the July meeting, the Defendants took significant steps towards effectuating the merger. On August 7, 1997, RPT and the Defendants announced a Formation Agreement for Project Grand Slam. On August 28, 1997, RPT sent its shareholders (including SDG) proxy materials for a shareholders' meeting on September 30, 1997 to vote on the project. The proxy materials included Lazard's opinion that Project Grand Slam was fair to RPT's shareholders and recommended that RPT shareholders should vote in favor of Project Grand Slam at the September 30 meeting.

On or about August 28, 1997, SDG announced a tender offer for the remainder of RPT's outstanding shares at $17.50 per share. This offer was scheduled to expire on September 25, 1997.

SDG countered further by filing this lawsuit on September 5, 1997 accusing the Defendants of securities fraud in the acquisition of the RPT stock which the Defendants had purchased earlier in the year from the institutional holders in the transactions mentioned above. On the same day that the lawsuit was filed, SDG sent an explanatory letter "TO ALL SHAREHOLDERS OF RETAIL PROPERTY TRUST." In this letter, SDG wrote:

....We have reluctantly brought this action because we believe the [D]efendants and those acting in concert with them have

purchased, or are engaged in the purchase of, Shares or voting rights in violation of the anti-fraud provisions of the [Exchange Act] in an effort to block our tender offer. We further believe that the continuation of these purchases will jeopardize your opportunity to achieve maximum value for your shares.

Because of the nature of the litigation and our belief that SDG's offer both maximizes shareholder value and brings certainty of execution to those who wish to dispose of their Shares, we would strongly urge you not to sell or commit to sell any of your Shares or voting rights to the [D]efendants or persons or entities acting in concert with them....

In the lawsuit, SDG sought an injunction prohibiting the Defendants from purchasing any further shares of RPT, and from voting any RPT shares or exercising voting rights allegedly acquired in violation of Rule 10b–13, 17 C.F.R. § 240.10b–13, promulgated pursuant to Section 10(b) of the Exchange Act, and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated pursuant to Section 10(b) of the Exchange Act. SDG claimed that without an injunction, it would suffer "immediate" harm. The Defendants opposed SDG's motion for a preliminary injunction and for expedited discovery and moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted.

At the hearing on the motion, SDG reversed its course; it announced that it did not wish to proceed and moved to withdraw its application for an injunction. The reason given to the Court by SDG's counsel was that the Defendants, some four days earlier, had terminated the Formation Agreement and had canceled the shareholders' meeting set for September 30.

SDG requested that their motion for an injunction be denied without prejudice. However, under the circumstances, the court dismissed SDG's motion for an injunction with prejudice, and granted the Defendants' cross motion for dismissal of the complaint. This Court ruled that there was no substance to SDG's claims under either Rules 10b–13 or 10b–5 of the Exchange Act:

I think Project Grand Slam was neither a cash tender offer nor a cash exchange offer for any equity security. It's an asset purchase agreement under a plan to merge the shopping center of the [D]efendants with the shopping center assets of [RPT]. I don't know if the shareholders are going to convene on September 30, 1997 or whether that's been called off, but that's neither here nor there. We neither have a cash tender offer nor a cash exchange offer nor a transaction within the purview of Rule 10b–13. And there is law in the Second Circuit, in the Third Circuit and elsewhere which observes that an asset sale transaction is not the equivalent or tantamount to the acquisition of securities.

Moreover, the [SDG] is neither a purchaser or seller in any aspects of Project Grand Slam, nor with respect to the shares of RPT [acquired by the Defendants], nor do the [D]efendants have any fiduciary relationship with respect to [SDG] or RPT, nor is there any fraud pleaded with respect to any purchase or sale, The purchases in private transactions by the defendants of shares of RPT are not transactions within the purview of Rule 10b–5. No insider trading is involved. The motions for dismissal of the complaint are granted with costs to the defense....

Hearing on September 23, 1997 at 20.

### Discussion

1. *Section 21D(c)(1) of the Exchange Act, 15 U.S.C. § 78u–4(c)(1)*

The Private Securities Litigation Reform Act ("PSLRA") amended Title I of the Securities Act of 1933 and Title I of the Exchange Act. These amendments do not apply to actions commenced before or pending on the date of the PSLRA's enactment, December 22, 1995. *See* PSLRA § 108. The PSLRA applies here because SDG's complaint, which asserts claims under the Exchange Act, was filed on September 5, 1997, and related to events which occurred in 1997.

Of particular importance here, Section 101(b) of the PSLRA added a new provision, Section 21D, to the Exchange Act. Subsection (c) of Section 21D, is entitled "Sanctions

for abusive litigation." By its terms, this subsection applies "in *any private action* arising under this chapter [15 U.S.C. § 78a, *et seq.*]." (emphasis added). The provision requires that the court make specific findings regarding Rule 11:

> In any private action arising under this chapter [15 U.S.C. § 78a, *et seq.*], upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rule of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

Section 21D(c)(1), 15 U.S.C. § 78u–4(c)(1).

■ While SDG does not dispute that Section 21D(c) applies here, they have attempted to undermine its force by arguing that the PSLRA was directed at remedying abusive class actions or actions which seek damages. This argument is unpersuasive.

First, although the legislative history of the PSLRA makes clear that the PSLRA was intended primarily to reform "abusive securities class action litigation," Joint House–Senate Conference Report, H.R. Conf. Rep. No. 104–369, at 32(1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 731, the legislative history also recites a broader set of evils sought to be cured by the PSLRA—namely, "meritless securities lawsuits" and "abusive securities litigation," Joint House–Senate Conference Report, H.R. Conf. Rep. No. 104–369, at 39 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 730, 738, and "meritless claims," "abusive litigation," "abusive securities fraud suits" and "the unwillingness of courts to impose sanctions even when [Rule 11] is violated," S.Rep. No. 104–98, at 13 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 692. Thus, there is nothing in the legislative history which indicates that the phrase "in any private action" in Section 21D(c) was intended to be limited to "class actions" or "any damages action."

Second, where Congress intended to limit the applicability of certain provisions of the PSLRA to class actions, it did so expressly. For example, 21D(a), 15 U.S.C. § 78u–4(a), entitled "Private Class Actions," states that the provisions of that subsection "shall apply in each private action arising under this chapter *that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure.*" (emphasis added). The absence of such a limitation in Section 21D(c), 15 U.S.C. § 78u–4(c), indicates that the application of that subsection is broader than that of Section 21D(a), 15 U.S.C. § 78u–4(a). *See BFP v. Resolution Trust Corporation,* 511 U.S. 531, 537, 114 S.Ct. 1757, 1761, 128 L.Ed.2d 556 ('[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another'. . . .) (citations omitted).

Third, the case law which has developed under the PSLRA demonstrates that Section 21D(c) applies in "any private action" under the 1934 Act, not just class actions. In *Richter v. Achs,* 174 F.R.D. 316 (S.D.N.Y. 1997) this Court applied Section 21D(c), 15 U.S.C. § 78u–4(c), in a non-class action brought under Rule 10b–5 by two shareholders of a closely held corporation. Moreover, the "any private action" language in Section 21D(c) appears in other subsections of the PSLRA. Two courts interpreting these other subsections in the statutory amendment have expressly rejected the argument that these subsections apply only to securities class actions. In *In Re Trump Hotel Shareholder Derivative Litigation,* 1997 WL 442135, *1 (S.D.N.Y. Aug.5 1997), the plaintiff argued that Section 21D(b)(3)(B), which provides for stay of discovery in "any private action" pending a ruling on a motion to dismiss, applies only to class actions. The court disagreed, noting the following:

> First, [plaintiffs] contend that Section 21D(b)(3)(B) has no application here because it is a derivative action, not a class action, and the PSLRA was intended to deal with abuses that Congress believed had developed in such class actions. Although class actions were certainly one of Congress' concerns in enacting the PSLRA, the text of the statute does not support plaintiffs' interpretation. Subsection 21D(a), 15 U.S.C. § 78u–4(c), of the PSLRA is specifically limited to class actions. Subsection

21D(b), however, contains no such limitation. Since 'it is generally presumed that Congress acts intentionally and purposefully when it includes particular language in one section of a statute but omits it in another,' (citations omitted), plaintiffs' argument that the stay provisions of Section 21D(b) applies only to class actions must be rejected.

In a similar case, the plaintiff argued that the stay provisions should apply only in damages actions, not injunction actions brought by corporations. *See Medical Imaging Centers of America, Inc. v. Lichtenstein*, 917 F.Supp. 717, 719–21 (S.D.Cal.1996). The court disagreed, holding that "the legislation by its terms does not carve out specific types of actions which will be exempt from the stay." *Id.*

Courts have also applied 21D(b)(1) and (2), which heighten the pleading standard for fraud "in any private action" arising under the Exchange Act, without regard for whether the action was a class action or not. *Fugman v. Aprogenex, Inc.*, 961 F.Supp. 1190, 1195 (N.D.Ill.1997); *Rosenbaum & Co. v. H.J. Myers & Co., Inc.*, 1997 WL 689288 (E.D.Pa., October 9, 1997).

Accordingly, pursuant to Section 21D(c), 15 U.S.C. § 78u-4(c), this Court must make the specific findings herein regarding SDG's compliance with Rule 11 as called for by the statute.

### 2. *Rule 11*

Rule 11(b) provides, in pertinent part, as follows:

(b) By presenting to the court...a pleading, written motion, or other paper, an attorney...is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

(1) it is not being presented for any *for any improper purpose,* such as to harass or cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are *warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law* ;

(3) the allegations and other factual contentions have *evidentiary support*
....

(emphasis added).

The defendants urge that an assessment of sanctions is appropriate because SDG never intended to litigate its claims in court, that its claims were frivolous and had no chance of success, and instead that SDG utilized the judicial process as part of a publicity campaign against the defendants in order to obstruct Project Grand Slam and advance its ulterior motive of completing a "tender offer" for the shares of RPT.

### a. SDG's Claims Were Frivolous

■ The Second Circuit has explained: "An argument constitutes a frivolous legal position for the purposes of Rule 11 sanctions if, under an 'objective standard of reasonableness' it is clear...that there is no chance of success and no reasonable argument to extend, modify or reverse the law as· it stands." *Morley v. Ciba–Geigy Corp.*, 66 F.3d 21, 25 (2d Cir.1995) (quoting *Caisse Nationale de Credit Agricole–CNCA v. Valcorp, Inc.*, 28· F.3d 259, 264 (2d Cir.1994)). Rule 11 sanctions for frivolous claims "are very serious, and courts should not impose them lightly." *Macmillan, Inc. v. American Express Company*, 125 F.R.D. 71, 79 (S.D.N.Y.1989). Under those criteria, SDG's 10b–13 and 10b–5 claims under the Exchange Act were frivolous.

SDG's argument that Project Grand Slam was a cognizable tender offer and thus within the purview of Rule 10b–13 was wholly without merit. In its complaint, SDG found that "the agreements comprising Project Grand Slam constitute a tender offer or exchange offer for the shares if RPT within the meaning of Rule 10b–13." SDG's Complaint at 8. In its initial brief in support of its preliminary injunction motion, SDG substantiated this contention by asserting that Project Grand Slam "has all the elements of an exchange offer in that investors are being asked to vote on a transaction in which they effectively give up their shares in RPT in

exchange for shares of a newly formed REIT." SDG's Memorandum Of Law In Support Of Its Motion for Preliminary Injunction and Expedited Discovery at 8. SDG's conclusory statement not only failed to adequately explain why Project Grand Slam was an exchange or tender offer, it also ignored the relevant case law in this Circuit which clearly expresses the principle that mergers are not "tender offers" under the securities laws. *See e.g. Kramer v. Time Warner, Inc.,* 937 F.2d 767, 779 (2d Cir.1991) (state and federal laws clearly treat mergers as distinct from tender offers); *West Shore Fuel, Inc. v. United States,* 598 F.2d 1236, 1242–43 (2d Cir.1979) (plan of merger and liquidation is different from a tender offer because individual shareholders could not elect whether to sell or retain their stock but could only vote for or against a plan of merger and liquidation, and once approved by the appropriate majority, an individual shareholder had only a right to receive a liquidation distribution); *Beaumont v. American Can Co.,* 621 F.Supp. 484, 500–01 (S.D.N.Y.1985) (merger approved by shareholders pursuant to proxy materials is not a tender offer), *aff'd by* 797 F.2d 79 (2d Cir.1986).

When SDG finally addressed this issue in their memorandum of law in further support of their motion for a preliminary injunction and in opposition to the Defendants' motion to dismiss, they failed to cite a single authority which supported the position that a merger, such as that contemplated by Project Grand Slam, should be treated as a tender offer under the Williams Act. Instead SDG cited two district court cases from other jurisdictions which stand for the principle that "unorthodox" transactions are tender offers for the purposes of the securities laws if they threaten shareholders with the evils that Congress and the S.E.C. sought to prevent. *See Zuckerman v. Franz,* 573 F.Supp. 351 (S.D.Fla.1983); *S.E.C. v. Texas Int'l Co.,* 498 F.Supp. 1231, 1239–40 (N.D.Ill.1980).[1] However, SDG's argument failed to explain sufficiently how Project Grand Slam was "unorthodox" as opposed to a merger of the assets of three private businesses, and even if the transaction was unorthodox, why this Court should adopt the rationales provided by the courts of these other jurisdictions.[2]

Moreover, even if Project Grand Slam could be construed as a tender offer, SDG's claim was frivolous because SDG plainly did not have standing to sue under Rule 10b–13. This Circuit has repeatedly expressed doubt that a private right of action exists under Rule 10b–13. *See Field v. Trump,* 850 F.2d 938, 946 (2d Cir.1988); *Beaumont,* 797 F.2d at 83–84. SDG did not address this issue in either their complaint or the initial brief in support of the motion for a preliminary injunction; indeed it did not acknowledge any question as to whether a private claim could be founded on Rule 10b–13. When SDG addressed this issue in its later memorandum of law, it directed the court's attention to authorities from other jurisdictions in which a private right of action under Rule 10b–13 was implied from *an investor who tendered securities in response to a tender offer.* On such facts, this Circuit has reached a similar conclusion. *See Beaumont,* 797 F.2d at 84 ("Even assuming...that there is an implied private right of action under [Rule 10b–13], plaintiffs have no standing to complain. Plaintiffs are not among the class of persons

---

1. Only ten days after SDG's submission of their initial brief, SDG had retreated from their statement that Project Grand Slam contained "all the elements of an exchange offer" and instead were willing to concede that Project Grand Slam only contained "many elements of a conventional tender offer." SDG's Memorandum of Law in Further Support of a Motion For Preliminary Injunction And In Opposition To Defendants' Motion To Dismiss at 12.

2. SDG's main argument in support of Williams Act protection was RPT shareholders need protection because RPT's securities are unregistered and therefore RPT shareholders are not afforded the protections normally provided by Section 13(d) of the Exchange Act. This argument is curious at best considering the assumed sophistication of RPT's many institutional shareholders and the fact that courts have been reluctant to impose the detailed requirements of the Exchange Act on privately negotiated transactions involving a limited number of shareholders such as the kind contemplated by Project Grand Slam. *See e.g. Pin v. Texaco, Inc.,* 793 F.2d 1448, 1454–55 ("the allegations of the complaint could establish nothing more than a privately negotiated transaction, which does not qualify as a tender offer, and is thus not actionable under Section 13(e).").

intended to be protected by Rule 10b–13—they did not tender stock [in the tender offer].") (citations omitted). SDG did not sell any shares of RPT to the Defendants. Not only did SDG fail to acknowledge this obstacle to their assertion of a private right of action, SDG failed to identify one single authority recognizing a private right of action under Rule 10b–13 for a nontendering shareholder. *See Knipe v. Skinner,* 19 F.3d 72, 76 (2d Cir.1994) (Rule 11 is satisfied "[s]o long as counsel is candid about a legal theory's prior lack of success . . . .").

In *MacMillan v. American Express Co.,* 125 F.R.D. 71, 78 (S.D.N.Y.1989), cited by SDG in purported support of a finding that sanctions not be assessed, the court declined to impose Rule 11 sanctions on a party that improperly asserted a private right of action under Rule 10b–13. However, that holding is inapplicable to the present case. *MacMillan,* involved a bona fide actual tender offer, which was not the case here. Moreover, *MacMillan* pre-dated the enactment of Rule 21D(c), 15 U.S.C. § 78u–4(c), which was designed to give more "teeth" to Rule 11 because of a determination that the "[e]xisting Rule 11 has not deterred abusive securities litigation." H.R. Conf. Re. No. 104–369, at pg.39, *reprinted in U.S.C.C.A.N.* 679, 738.

Based on these findings, SDG is sanctioned for initiating a frivolous Rule 10b–13 claim.

■ The Rule 10b–5 claim asserted by SDG in its complaint was defective with respect to every element of a proper Rule 10b–5 claim. SDG was neither a purchaser nor seller in any aspect of Project Grand Slam; there was no fiduciary relationship between the parties to the suit; and the allegations of fraud were insufficient. In the one paragraph in SDG's initial memorandum of law dealing with the Defendants' alleged Rule 10b–5 violation, SDG simply bypassed these deficiencies.

When SDG finally addressed some of these issues in their memorandum of law in further support of their motion for a preliminary injunction and in opposition to the Defendants' motion to dismiss, SDG nonetheless failed to state sufficiently reasonable grounds for overcoming these defects to their Rule 10b–5 claim. In addition, SDG did not state

reasonable grounds as to why the court should ignore these deficiencies and afford SDG relief under Rule 10b–5 notwithstanding.

According to these findings with respect to SDG's Rule 10b–5 claim, imposition of sanctions on SDG is appropriate.

### b. Improper Purpose

■ A court must make an objective assessment in considering a Rule 11 claim of whether the complaint lacks "any legitimate purpose." *Sussman v. Bank of Israel,* 56 F.3d 450, 458–459 (2d Cir.1995). Subjective evidence of the party's or attorney's purpose must be "disregarded." *Id.* at 459 (citing *Townsend v. Holman Consulting Corp.,* 929 F.2d 1358, 1362 (9th Cir.1990) (en banc)). The utter frivolity of SDG's claims and their failure to offer reasonable justification as to why either Rule 10b–13 or Rule 10b–5 should be extended, modified, or reversed on their behalf indicates that SDG abused the judicial process in its attempt to thwart the Defendants' Project Grand Slam proposal.

### Conclusion

The court finds that both SDG and its counsel, Gordon Altman, have violated Rule 11. The appropriate sanction for violations of Rule 11(b) is "an award to the opposing party of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation." *See* Section 21D(c)(3), 15 U.S.C. § 78u–4(c)(3). Such an award is appropriate here.

The Defendants have submitted affidavits outlining their costs and expenses incurred in meeting SDG's violations of Rule 11. The firm of Thompson Hine & Flory LLP ("TH & L") of Cleveland, Ohio, which represented defendant Richard E. Jacobs Group, Inc., claims to have assembled a litigation team of four principal attorneys to meet SDG's suit and application therein seeking an injunction. Together, TH & L's attorneys claim to have recorded approximately 675.75 hours defending the case from September 8, the date of the receipt of the complaint, through September 23, the date of the dismissal of the complaint, at rates ranging from $80 per

hour to $300 per hour for a total lodestar fee of $137,843.75 and incurred expenses of $17,149.53 involving travel, maintenance, and technical costs.

The firm of Goulston and Storrs, P.C. ("GS") of Boston, Massachusetts, representing defendant New England Development, Inc. for the same period, fifteen days, claims to have applied the services of "numerous attorneys" (in total seven) to the case, involving 613.80 hours of billable time at rates ranging from $130 to $380 per hour which is calculated to the amount of $148,964 exclusive of charges and expenses.

Gould & Wilkie, hired by both TH & F and GS as local counsel, report an estimated lodestar fee for approximately 37.5 hours defending the case on behalf of the Defendants during the same period for an estimated lodestar fee amount of $8,653.75 and $533.94 in expenses.

Having evaluated the foregoing and on due deliberation of the purposes of sanctions and the court's estimate of reasonable attorneys' fees and expenses of the defense to SDG's claims and under all the facts and circumstances appearing herein, it is the court's Opinion and Findings that the fair and reasonable sanctions to be imposed should be, and the amount awarded to be paid to the Defendants for Cleveland and their New York local counsel is *$50,000.* and for Boston counsel and their New York local counsel is *$50,000.* Said amounts are awarded against SDG and Gordon Altman jointly and severally and shall be paid within ten days from the date of these findings.

So Ordered