**SIMON DeBARTOLO GROUP, L.P., Plaintiff–Appellant,**

**Gordon Altman Butowsky Weitzen Shalov & Wein, Appellant,**

**v.**

**The RICHARD E. JACOBS GROUP, INC., and New England Development, Inc., Defendants–Appellees.**

**Docket No. 97–9613**

United States Court of Appeals, Second Circuit.

Argued: Nov. 16, 1998.

Decided: July 28, 1999.

Theodore Altman, Lawrence J. Zweifach, Samuel L. Barkin, Gordon Altman Butowsky Weitzen Shalov & Wein, New York, NY, Andrew L. Frey, Melanie L. Oxhorn, Mayer, Brown & Platt, New York, NY, for Appellants.

Rudolph F. Pierce, Leonard H. Freiman, Martin M. Fantozzi, Goulston & Storrs, P.C., Boston, MA, for Defendant–Appellee New England Development, Inc.

David J. Hooker, Daniel R. Warren, Brian J. Lamb, Kittie D. Warshawsky, Thompson Hine & Flory LLP, Cleveland, OH, for Defendant–Appellee The Richard E. Jacobs Group, Inc.

John E. Gould, Michael R. Manley, Gould & Wilkie, New York, NY, for Defendants–Appellees.

Before: CALABRESI, SACK, and SOTOMAYOR, Circuit Judges.

SACK, Circuit Judge:

This appeal arises out of a contest for control of a real estate investment trust waged throughout the summer and fall of 1997 between plaintiff Simon DeBartolo Group, L.P., and a group including defendants The Richard E. Jacobs Group, Inc. and New England Development, Inc. The contest began with the defendants' proposal to form a new entity that would be endowed, in exchange for ownership units, with the trust's sole asset and some of the defendants' assets. DeBartolo responded with a tender offer for control of the trust itself. Then, with a shareholder vote on the defendants' proposal looming, DeBartolo filed suit alleging that the defendants' attempts to ensure shareholder approval of their proposal had violated SEC Rules 10b–5 and 10b–13 and seeking to enjoin the defendants from purchasing more shares of the trust and from voting shares already acquired. The defendants responded with a successful motion to dismiss.

The United States District Court for the Southern District of New York (Pollack, *J.*) concluded that both DeBartolo and its counsel, Gordon Altman Butowsky Weitzen Shalov & Wein ("Gordon Altman"), had violated Federal Rule of Civil Procedure 11(b)(1) and (2), and sanctioned them jointly in the amount of $100,000. *See Simon DeBartolo Group, L.P. v. The Richard E. Jacobs Group, Inc.,* 985 F.Supp. 427, 433–34 (S.D.N.Y.1997). DeBartolo and Gordon Altman together appeal from this conclusion and the award.

For the reasons set forth below, we affirm in part, reverse in part, and remand

for a redetermination of the sanctions to be awarded in accordance with this opinion.

## BACKGROUND

The Real Property Trust ("RPT") was a privately held real estate investment trust possessing a single asset: a general partnership interest in Shopping Center Associates, a major owner and developer of, not surprisingly, shopping centers. In November 1996, dissatisfied with the performance of RPT shares, RPT's board of trustees appointed a special committee of unaffiliated trustees (the "Special Committee") to explore options for increasing shareholder value. Toward that end, the Special Committee retained Lazard Frères & Co. LLC as its financial advisor.

The Special Committee was not alone in testing the waters, however. At about this time, RPT chairman and CEO Jeremiah W. O'Connor, Jr., began discussions with the defendants, New England and Jacobs, concerning a potential sale or exchange of RPT's interest in Shopping Center Associates. New England and Jacobs are, respectively, Massachusetts and Delaware corporations involved in the ownership and operation of shopping centers around the country. In December 1996, O'Connor caused RPT to enter into a series of confidentiality agreements with the defendants stating that the parties were contemplating a transaction involving a potential business combination, that "the parties' discussions and negotiations [would] involve matters of a confidential nature which [would] require the parties to repose in one another the highest trust and confidence," and that the defendants would use the confidential information solely for purposes of the contemplated transaction.

In accordance with these agreements, RPT provided the defendants with information concerning the assets and financial condition of RPT such as rent rolls, lease provisions, site plans, and projections for properties owned by RPT or Shopping Center Associates. This information was neither public nor otherwise available to RPT's shareholders.

By March 1997, O'Connor's negotiations had evolved into a specific proposal, and with the assistance of the defendants' financial advisor, Goldman Sachs & Co., he presented "Project Grand Slam" to RPT's board. In substance, Project Grand Slam contemplated that RPT would contribute its general partnership interest in Shopping Center Associates to a newly formed partnership in exchange for ownership units in the new partnership. Similar exchanges would take place between the new partnership and a series of other entities including the defendants, WellsPark Group Limited Partnership, Whitehall Street Real Estate Limited Partnership VII ("Whitehall"), and a group controlled by O'Connor (collectively, the "Grand Slam parties"). The new partnership would then become a real estate investment trust (the "new REIT"), with its ownership units converted into shares. RPT in turn would be liquidated, causing its remaining assets—its shares in the new REIT—to be distributed to its shareholders. The new REIT subsequently would be taken public, and the former RPT shareholders would be entitled to sell their shares in the new REIT after a one-year holding period.

Project Grand Slam, ultimately subject to approval by RPT's shareholders, was not immediately endorsed by RPT's board. Instead, the board directed Lazard to evaluate the proposal, compare it to competing proposals, and conduct further negotiations with the Grand Slam parties.

In April 1997, Simon DeBartolo Group, L.P.—another large owner of shopping center properties, and also an RPT shareholder—contacted Lazard and expressed its interest in acquiring either RPT itself or its interest in Shopping Center Associates. After considering DeBartolo's overture and others, however, Lazard endorsed Project Grand Slam as the best prospect for increasing RPT shareholder value.

RPT's board subsequently signed a non-binding letter of intent with the Grand Slam parties.

That summer, the defendants took steps to ensure that RPT's shareholders approved Project Grand Slam. In July 1997, defendants and Whitehall quietly executed an agreement setting forth what they dubbed "Project Triple Play," in which they pledged (1) to commit a total of $250,000,000 for the purchase of RPT shares, (2) to vote their RPT shares in favor of Project Grand Slam, and (3) not to transfer their RPT shares to DeBartolo.

In short order, Whitehall acquired approximately three million shares of RPT in a pair of purchases.[1] Subsequently, on August 20, the defendants purchased 1,314,406 RPT shares at $16.50 per share from the Howard Hughes Medical Institute, and on August 25, the defendants purchased 880,267 RPT shares at $16.54 per share from the Board of Administration of the City Employees Retirement System of the City of Los Angeles.[2] Each of the purchase agreements memorializing these transactions contained a provision acknowledging that the purchaser was engaged in negotiations with RPT and as a consequence was or may have been in possession of material inside information regarding RPT at the time of the transaction.

DeBartolo, meanwhile, was not idle. It, too, began to increase its position in RPT, acquiring on July 15, 1997, 470,000 RPT shares at $14.50 per share from RJR Nabisco, Inc.'s Defined Master Trust and 1,175,000 RPT shares at $14.75 per share from The Board of Pensions of The Presbyterian Church (U.S.A.). A few weeks later, DeBartolo acquired 362,562 RPT shares at $14.50 per share from Lend Lease Corporation Ltd. and Lend Lease

Securities and Investments PTY Ltd. Finally, on August 20, it acquired 250,000 RPT shares at $16.00 per share from The Edward J. DeBartolo Corporation.

On August 8, 1997, RPT's board announced that the Special Committee had approved Project Grand Slam, and that RPT had reached an agreement with the Grand Slam parties to go forward with the proposal (the "Formation Agreement"). The Formation Agreement was qualified, however, by a clause permitting RPT's unaffiliated trustees to terminate the agreement, for a fee to be paid by RPT to the Grand Slam parties, should RPT receive a superior offer on or before September 10, 1997. A shareholder meeting to vote on Project Grand Slam was scheduled for September 30, 1997.

On August 28, 1997, RPT distributed proxy materials for the upcoming shareholder meeting. The materials included Lazard's opinion letter to the effect that Project Grand Slam was fair to RPT shareholders and the recommendation of RPT's board that shareholders vote in favor of the proposal. In addition, the materials disclosed that the defendants and Whitehall collectively had acquired twenty-four percent of RPT's outstanding shares, and intended to acquire more in an effort to ensure approval of Project Grand Slam.

DeBartolo was not dissuaded. On August 28, 1997, the same day RPT distributed its proxy materials, DeBartolo announced an all-cash tender offer to purchase RPT shares at $17.50 per share. The offer, scheduled to expire on September 25, 1997, was contingent on DeBartolo's acquisition of a majority interest in RPT. DeBartolo already was the beneficial owner of 5.9 percent of outstanding RPT shares.

---

1. On July 16, 1997, Whitehall purchased 2,290,956 shares at $15.00 per share from U.S. West Master Trust. On July 24, 1997, Whitehall purchased 648,000 shares at $15.00 per share from the Delaware State Employees' Retirement Fund.

2. In addition, the defendants temporarily acquired voting rights to 3,956,688 RPT shares held by the New York State Common Retirement Fund.

The following week, DeBartolo expanded the contest into the courtroom. On Wednesday, September 3, 1997, two days after Labor Day, DeBartolo retained appellant the Gordon Altman law firm to assess its legal options in view of the defendants' pursuit of Project Grand Slam and their related purchases of RPT shares. Two days later, on Friday, September 5, DeBartolo and Gordon Altman filed a complaint alleging that (1) Project Grand Slam constituted a tender offer and thus the defendants' purchases of RPT shares outside the terms of that offer violated SEC Rule 10b-13 and (2) the defendants' purchases of RPT shares, while in possession of undisclosed material inside information, violated SEC Rule 10b-5. The complaint requested the court to enjoin the defendants from making any further unlawful purchases of RPT shares and from voting any of the unlawfully acquired shares in favor of Project Grand Slam.[3]

The same day the complaint was filed, DeBartolo issued a letter to all RPT shareholders advising them of the suit and describing alleged efforts by the defendants to block DeBartolo's tender offer. The letter also urged shareholders not to sell their shares or voting rights to the defendants. DeBartolo also offered to send shareholders complimentary copies of the complaint upon request.

On September 9, 1997, DeBartolo moved for a preliminary injunction granting the relief requested in the complaint, as well as expedited discovery. The defendants refused to consent to an immediate hearing on the motion by teleconference, however, and the question of when the hearing would be held was put off until a conference before Judge Cedarbaum on September 11.

The next day, September 10, DeBartolo amended its tender offer, raising the all-cash price to $19.375 per share. The higher price resulted from the RPT board's

agreement with DeBartolo that it would declare the tender offer, at that price, a superior offer under the terms of the Project Grand Slam Formation Agreement. Consequently, if the defendants could not match or top DeBartolo's offer, RPT would be entitled to terminate the Formation Agreement for a $20 million fee to be paid to the Grand Slam parties.

The following day, the defendants struck back with a motion to dismiss DeBartolo's complaint. Judge Cedarbaum scheduled a hearing on DeBartolo's preliminary injunction motion for September 18, 1997. Shortly thereafter, however, Judge Cedarbaum recused herself. The case was reassigned to Judge Pollack, who adjourned the hearing, *sua sponte*, until September 23, 1997.

With both motions pending and the shareholder vote on Project Grand Slam fast approaching, the defendants continued their efforts to acquire shares of RPT and thereby ensure the success of their proposal. These efforts prompted a letter of protest from the RPT board's Special Committee, which was no longer favorably disposed to Project Grand Slam.

On September 19, 1997, the defendants and the other Grand Slam parties threw in the towel, agreeing to terminate the Formation Agreement. Although the parties by this time had filed and served voluminous papers in connection with the upcoming motion hearing, the court was not immediately notified of Project Grand Slam's collapse.

DeBartolo learned of the termination from RPT the day it occurred, and received a confirmatory letter from the defendants on September 20. In their letter, the defendants requested DeBartolo to withdraw its preliminary injunction motion and to dismiss the lawsuit as moot. DeBartolo did not immediately agree. Instead, the parties negotiated over the

**3.** The complaint originally requested damages as an alternative remedy, but this request later was withdrawn.

weekend and, on Monday, September 22, DeBartolo agreed to withdraw the preliminary injunction motion. Again, however, the court was not notified.

The hearing was held the next day, September 23, 1997. DeBartolo opened by informing Judge Pollack for the first time of the demise of Project Grand Slam, and then sought leave to withdraw its preliminary injunction motion. Instead, the court denied it with prejudice.

This left pending the defendants' motion to dismiss the suit. After hearing argument on the merits of DeBartolo's 10b–5 and 10b–13 claims, the court reached the following conclusions:

> You know, your office [*i.e.*, the Gordon Altman firm] is right at the top of the securities vehicle, and I am utterly amazed that you have a claim here. I don't get it. It's an out and out case of a competitor seeking to harm another, that's all. I just don't understand how you can put this into a Williams Act context or in any context when there is sufficient basis for the assertion of these ponderous papers. I'm really amazed, and my curiosity was raised so that I went through all the papers to see whether I had overlooked something. The more I did with these papers, the more surprised that I became at this claim having been asserted.
>
> I think Project Grand Slam was neither a cash tender offer nor a cash exchange offer for any equity security. It's an asset purchase agreement under a plan to merge shopping center assets of the defendants with the shopping center assets of the Retail Property Trust. I don't know whether the shareholders are going to convene on September 30th, 1997 or whether that's been called off, but that's neither here nor there. We neither have a cash tender offer nor a cash exchange offer nor a transaction within the purview of 10b–13. And there is law in the Second Circuit, in the Third Circuit and elsewhere which observes that an asset sale transaction is not the equivalent or tantamount to the acquisition of securities.

> Moreover, the plaintiff is neither a purchaser nor a seller in any aspect of Project Grand Slam, nor with respect to the shares of RPT, nor do the defendants have any fiduciary relationship with respect to the plaintiff or RPT, nor is there any fraud pleaded with respect to any purchase or sale. The purchases in private transactions by the defendants of shares of RPT are not transactions within the purview of Rule 10b–5. No insider trading is involved. The motions for dismissal of the complaint are granted with costs to the defense. An order will be entered accordingly.

Despite thus losing the battle, DeBartolo subsequently appeared to win the war, as it completed its tender offer and acquired majority control of RPT. The defendants, however, were not resigned to what might be termed their Pyrrhic defeat—they did, after all, receive a major portion of the $20 million termination fee as well as the profits from their eventual sale of RPT shares to DeBartolo. In a letter to the court on September 30, 1997, the defendants drew the court's attention to its obligation, under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4(c), to make findings on the record concerning the compliance of DeBartolo and Gordon Altman with Fed.R.Civ.P. 11, which authorizes sanctions in certain circumstances. After the parties fully briefed the Rule 11 issue, the court requested additional briefing on the question of the substantive impact of the Private Securities Litigation Reform Act on the sanctions determination. The court also directed the defendants to provide an affidavit setting forth their fees and expenses incurred in defending the case. In response, the defendants provided a calculation of $312,665 in fees and expenses.

In an opinion and order issued on December 12, 1997, Judge Pollack sanctioned both DeBartolo and Gordon Altman for asserting frivolous legal claims in violation

of Rule 11(b)(2), and for filing suit for an improper purpose contrary to Rule 11(b)(1). *See Simon DeBartolo Group,* 985 F.Supp. at 431–33. The court awarded the defendants $100,000 in sanctions for which DeBartolo and Gordon Altman would be jointly and severally liable. *See id.* at 434. DeBartolo and Gordon Altman appeal.

## DISCUSSION

The issue of sanctions brings to the surface the tension between the goal of discouraging abuse of the legal system and that of encouraging refinement of the law through the assertion of novel but nonfrivolous legal theories. The question before us is whether the district court correctly determined that appellants crossed the line between innovation and frivolousness in their efforts to derail Project Grand Slam and secure control of RPT for DeBartolo.

I. The Sanctions Regime

A. *Fed.R.Civ.P. 11(b)*

Fed.R.Civ.P. 11, which confers on a district court authority to sanction a litigant or its counsel, provides in relevant part:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—
>
> > (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; [and]
> >
> > (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law[.]

Fed.R.Civ.P. 11(b). The 1993 Advisory Committee Note explains that Rule 11(b)(2) "establishes an objective standard, intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments." Fed.R.Civ.P. 11 advisory committee note to 1993 amendments. In addition, "the extent to which a litigant has researched the issues and found some support for its theories even in minority opinions, in law review articles, or through consultation with other attorneys should certainly be taken into account in determining whether paragraph (2) has been violated." *Id.* "Although arguments for a change of law are not required to be specifically so identified, a contention that is so identified should be viewed with greater tolerance under the rule." *Id.*

Once a court determines that Rule 11(b) has been violated, it may in its discretion impose sanctions limited to what is "sufficient to deter repetition of such conduct." Fed.R.Civ.P. 11(c)(2); *see also* Fed.R.Civ.P. 11 advisory committee note to 1993 amendments. The court may impose, among other things, monetary sanctions. *See* Fed.R.Civ.P. 11(c)(2). Monetary sanctions, however, "may not be awarded against a represented party for a violation of subdivision (b)(2)," Fed.R.Civ.P. 11(c)(2)(A), because "[m]onetary responsibility for such violations is more properly placed solely on the party's attorneys," Fed.R.Civ.P. 11 advisory committee note to 1993 amendments.

B. *The Private Securities Litigation Reform Act of 1995*

 Ordinarily, courts are under no particular obligation to make findings with regard to the compliance of litigants and their counsel with Rule 11 or to impose sanctions once a violation is found. *See* Fed.R.Civ.P. 11(c)(1). This is no longer the case, however, in the securities litigation context. Recognizing what it termed "the need to reduce significantly the filing of meritless securities lawsuits without hindering the ability of victims of fraud to

pursue legitimate claims," and commenting that the "[e]xisting Rule 11 has not deterred abusive securities litigation," the 104th Congress included in the Private Securities Litigation Reform Act of 1995 ("PSLRA") a measure intended to put "teeth" in Rule 11. H.R. Conf. Rep. No. 104–369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730. In relevant part, the PSLRA added Section 21D(c) to the Securities Exchange Act of 1934 ("Exchange Act"), requiring courts, at the conclusion of all private actions arising under the Exchange Act, to make specific findings as to the compliance by all parties and attorneys with Fed.R.Civ.P. 11(b). *See* 15 U.S.C. § 78u–4(c)(1). Section 21D(c) requires also that the court impose sanctions if it determines the rule has been violated, and adopts a rebuttable presumption that the appropriate sanction for a complaint that substantially fails to comply with Rule 11(b) "is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred in the action." 15 U.S.C. § 78u–4(c)(3)(A)(ii). The PSLRA thus does not in any way purport to alter the substantive standards for finding a violation of Rule 11, but functions merely to reduce courts' discretion in choosing whether to conduct the Rule 11 inquiry at all and whether and how to sanction a party once a violation is found.

### C. Standard of Review for a Rule 11 Determination

█ In *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990), the Supreme Court held that "an appellate court should apply an abuse-of-discretion standard in reviewing all aspects of a district court's Rule 11 determination." *Id.* at 405, 110 S.Ct. 2447. In so holding, the Court purported to reject the practice of some circuits, including ours, *see, e.g., McMahon v. Shearson/American Express, Inc.*, 896 F.2d 17, 21 (2d Cir.1990), of conducting a *de novo* review of the district court's legal conclusions, including whether a claim is warranted by existing law or constitutes a

good faith argument for changing the law. *See Cooter & Gell*, 496 U.S. at 399–405, 110 S.Ct. 2447. At the same time, however, the Court was careful to qualify the abuse-of-discretion standard as it relates to legal conclusions by stating that

> this standard would not preclude the appellate court's correction of a district court's legal errors, *e.g.*, ... relying on a materially incorrect view of the relevant law in determining that a pleading was not "warranted by existing law or a good faith argument" for changing the law. An appellate court would be justified in concluding that, in making such errors, the district court abused its discretion.

*Id.* at 402, 110 S.Ct. 2447. Indeed, *Cooter & Gell* held that a ruling based on an erroneous view of the law "would necessarily abuse [the court's] discretion." *Id.* at 405, 110 S.Ct. 2447.

Construing *Cooter & Gell*'s "deferential" standard in *Mareno v. Rowe*, 910 F.2d 1043 (2d Cir.1990), *cert. denied*, 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991), we explained that "to constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." *Id.* at 1047 (reversing sanction award); *see also Sussman v. Bank of Israel*, 56 F.3d 450, 456 (2d Cir.) (holding that district court abused its discretion by imposing sanctions based on its erroneous conception of the law), *cert. denied*, 516 U.S. 916, 116 S.Ct. 305, 133 L.Ed.2d 210 (1995); *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 830–31 (2d Cir.1992) (reversing award of sanctions on ground that, in the absence of controlling authority to the contrary, party had good faith basis to press a legal argument supported by a single decision of a state court). This approach flows from *Cooter & Gell*'s direction that reviewing courts consider material errors of law to be *per se* abuses of discretion.

## II. Whether Appellants' Actions Were Sanctionable

The district court's decision to sanction appellants was premised on its conclusion that they violated Fed.R.Civ.P. 11(b) in two respects. *See Simon DeBartolo Group*, 985 F.Supp. at 433. First, the court concluded that appellants had violated Fed.R.Civ.P. 11(b)(2) because both the Rule 10b–5 and 10b–13 causes of action were frivolous. *See id.* Second, the court found that appellants had violated Fed. R.Civ.P. 11(b)(1) in that they had filed suit solely for the improper purpose of interfering with Project Grand Slam. *See id.* In reaching the latter conclusion, the court relied exclusively on its prior conclusion that appellants' legal theories were frivolous. *See id.* In accordance with the standard of review outlined above, the sole issue before us is whether the district court abused its discretion in reaching these conclusions.

### A. *Fed.R.Civ.P. 11(b)(2)—Whether the District Court Correctly Determined that Appellants' Legal Arguments Were Frivolous*

We first consider the district court's conclusion that both of appellants' causes of action were frivolous.

#### 1. *Appellants' Rule 10b–5 Cause of Action*

##### a. *Rule 10b–5 and Insider Trading*

■ Section 10(b) of the Securities Exchange Act of 1934 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange— . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Pursuant to this authority, the SEC promulgated Rule 10b–5, which states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. In general,

[i]n order to state a cause of action under section 10(b) and Rule 10b–5, "a plaintiff must plead that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury."

*Chill v. General Elec. Co.*, 101 F.3d 263, 266 (2d Cir.1996) (quoting *Acito v. IMC-ERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (second alteration in *Acito*; internal quotation marks and citation omitted)).

■ That Rule 10b–5 may be invoked in the particular context of insider trading is, of course, well-settled. *See United States v. O'Hagan*, 521 U.S. 642, 650, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997); *Dirks v. SEC*, 463 U.S. 646, 653, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); *Chiarella v. United*

*States,* 445 U.S. 222, 231, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); *United States v. Chestman,* .947 F.2d 551, 564–66 (2d Cir. 1991) (in banc), *cert. denied,* 503 U.S. 1004, 112 S.Ct. 1759, 118 L.Ed.2d 422 (1992); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 847–48 (2d Cir.1968) (in banc); *In re Cady, Roberts & Co.,* Exchange Act Release No. 34–6668, 40 S.E.C. 907, 911 (Nov. 8, 1961). Specifically, Rule 10b–5 prohibits a party from trading on undisclosed material non-public information in certain circumstances.

 Under the "traditional theory" of insider trading, this prohibition is limited by the requirement that the defendant be under a specific duty either to disclose or to abstain from trading.[4] *See Chiarella,* 445 U.S. at 228, 100 S.Ct. 1108; *Chestman,* 947 F.2d at 565. This duty does not, however, arise from the mere possession of material non-public information. *See Dirks,* 463 U.S. at 657–58, 103 S.Ct. 3255; *Chiarella,* 445 U.S. at 235, 100 S.Ct. 1108; *Chestman,* 947 F.2d at 565. "Rather, a duty to disclose or abstain arises only from a fiduciary or other similar relation of trust and confidence between [the parties to the transaction]." *Chestman,* 947 F.2d at 565 (quoting *Chiarella,* 445 U.S. at 228, 100 S.Ct. 1108 (quoting Restatement (Second) of Torts § 551(2)(a) (1976))) (alteration in *Chestman*; internal quotation marks omitted). Such a relationship exists, for example, between shareholders and the "officers, directors, and other permanent insiders of a corporation."[5] *O'Hagan,* 521 U.S. at 652, 117 S.Ct. 2199. Less obviously, in some circumstances the requisite relationship may arise between shareholders and a corporate outsider:

Under certain circumstances, such as where corporate information is revealed legitimately to an underwriter, accountant, lawyer, or consultant working for the corporation, these outsiders may become fiduciaries of the shareholders. The basis for recognizing this fiduciary duty is not simply that such persons acquired nonpublic corporate information, but rather that they have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes. When such a person breaches his fiduciary relationship, he may be treated more properly as a tipper than a tippee. For such a duty to be imposed, however, the corporation must expect the outsider to keep the disclosed nonpublic information confidential, and the relationship at least must imply such a duty.

*Dirks,* 463 U.S. at 655 n. 14, 103 S.Ct. 3255 (citations omitted); *see also O'Hagan,* 521 U.S. at 652, 117 S.Ct. 2199; *Chestman,* 947 F.2d at 565 ("This theory clothes an outsider with temporary insider status when the outsider obtains access to confidential information solely for corporate purposes in the context of 'a special confidential relationship.' ").

### b. *The Opinion Below*

Appellants alleged that the defendants violated Rule 10b–5 by engaging in insider trading, *i.e.,* purchasing RPT shares—in order to block shareholder consideration of any competing proposals, pursuant to Project Triple Play—while in possession of undisclosed material non-public informa-

---

**4.** By alleging nondisclosure of material inside information in contravention of a duty to disclose or to abstain, a plaintiff sufficiently alleges fraud for purposes of Rule 10b–5. *See, e.g., Ceres Partners v. GEL Assocs.,* 918 F.2d 349, 360 (2d Cir.1990).

**5.** For purposes of insider trading, it does not matter whether the insider is buying from an existing shareholder or selling to an entity who then becomes a shareholder. *See Chestman,* 947 F.2d at 565 n. 2; *cf. Cady, Roberts,*

40 S.E.C. at 913 & n. 21. "[I]t would be a sorry distinction to allow [an insider] to use the advantage of his position to induce the buyer into the position of a beneficiary, although he was forbidden to do so, once the buyer had become one." *Gratz v. Claughton,* 187 F.2d 46, 49 (2d Cir.) (Hand, L., *C.J.*), *cert. denied,* 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951), *quoted in Cady, Roberts,* 40 S.E.C. at 914 & n. 23.

tion about RPT that had been available to the defendants for the sole purpose of formulating Project Grand Slam. The district court gave short shrift to this claim:

> The Rule 10b–5 claim asserted by [De-Bartolo] in its complaint was defective with respect to every element of a proper Rule 10b–5 claim. [DeBartolo] was neither a purchaser nor seller in any aspect of Project Grand Slam; there was no fiduciary relationship between the parties to the suit; and the allegations of fraud were insufficient.

*Simon DeBartolo Group,* 985 F.Supp. at 433. Thus, the court appeared to conclude in substance that appellants' Rule 10b–5 claim was frivolous because (1) DeBartolo lacked standing to assert it and (2) the elements of the claim were absent in any event. We consider first the issue of standing.

### c. *DeBartolo's Standing*

The question of DeBartolo's standing to assert an insider trading claim arises because DeBartolo concededly had no transactions with the defendants. On the contrary, the basis for DeBartolo's claim is that the defendants failed to make necessary disclosures when trading with *other* RPT shareholders. The harm to DeBartolo flowed, if at all, from the collective impact of those transactions upon the chances of success of DeBartolo's tender offer.

 At first blush, that DeBartolo does not claim that it bought or sold securities as a result of the defendants' alleged fraud seems fatal to DeBartolo's standing. As the district court noted, *see id.,* the general rule is that Rule 10b–5 protects only those who are defrauded in the course of purchasing or selling securities. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 731, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Iroquois Indus., Inc. v. Syracuse China Corp.,* 417 F.2d 963, 965, 967 (2d Cir.1969), *cert. denied,* 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970); *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461, 464 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

The *Blue Chip Stamps–Birnbaum* rule is not without exceptions, however. Most important for present purposes, we have recognized that the rule does not necessarily extend to actions seeking injunctive relief. In *Crane Co. v. American Standard, Inc.,* 603 F.2d 244 (2d Cir.1979), although we concluded that a disappointed tender offeror could not assert a claim for damages under Rule 10b–5 because it was not itself a defrauded investor, we nonetheless found that the plaintiff had standing to assert a claim for injunctive relief.[6] *See id.* at 250–51 & n. 15, 254 & n. 23. The plaintiff in *Crane* had argued that it had been injured by its competitor's market manipulations, which, by raising the market value of the target's stock, tended to defeat the plaintiff's tender offer. *See id.* at 245–47. Similarly here, DeBartolo claimed that the defendants' fraudulent purchases of RPT stock tended to defeat

---

**6.** In doing so, we found support in *Piper v. Chris–Craft Indus.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), which held that a disappointed tender offeror had no cause of action for damages under Exchange Act § 14(e), 15 U.S.C. § 78n(e), but left open the question with respect to injunctive relief. *See Crane,* 603 F.2d at 254 n. 23 (citing *Piper,* 430 U.S. at 47 n. 33, 97 S.Ct. 926). Also, we emphasized that *Piper* had quoted with approval Judge Friendly's observation that the stage of preliminary injunctive relief "is the time when relief can best be given" in the context of corporate control contests, *id.*

(quoting *Piper,* 430 U.S. at 42, 97 S.Ct. 926 (quoting *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 947 (2d Cir.1969))) (internal quotation marks omitted), and that subsequent decisions had taken up *Piper*'s invitation and concluded that a tender offeror may have standing to assert a cause of action under § 14(e) where it seeks only injunctive relief, *see id.* (citing *Weeks Dredging & Contracting, Inc. v. American Dredging Co.,* 451 F.Supp. 468, 476 (E.D.Pa. 1978); *Humana, Inc. v. American Medicorp, Inc.,* 445 F.Supp. 613, 614 (S.D.N.Y.1977)).

its tender offer. In light of the fact that DeBartolo sought not damages but injunctive relief, therefore, *Crane* provides at least a good faith basis for DeBartolo's assertion of standing. *Cf. Mutual Shares Corp. v. Genesco, Inc.*, 384 F.2d 540, 546–47 (2d Cir.1967) (permitting corporation's shareholders to seek injunctive relief under Rule 10b–5, in order to prevent controlling persons from manipulating market price of stock, although they did not satisfy the purchaser-seller requirement); *Langner v. Brown*, 913 F.Supp. 260, 270 (S.D.N.Y.1996) (referring to "well-established Second Circuit precedent holding that, in seeking injunctive relief under a § 10(b) claim, a plaintiff does not have to show damages in connection with the purchase or sale of any security."); *Packer v. Yampol*, 630 F.Supp. 1237, 1241–43 (S.D.N.Y.1986) (same); Louis Loss & Joel Seligman, Fundamentals of Securities Regulation 856 (3d ed.1995) (noting that "[t]he Second Circuit did not apply its own *Birnbaum* ruling in private injunctive actions").

*John Labatt Ltd. v. Onex Corp.*, 890 F.Supp. 235 (S.D.N.Y.1995), cited by the defendants, is not to the contrary. It does not exclude the existence of an exception to the *Blue Chip Stamps–Birnbaum* rule for private injunctive actions. *See id.* at 247. *John Labattt*, like *GAF Corp. v. Milstein*, 324 F.Supp. 1062, 1072–73 (S.D.N.Y.), *aff'd in relevant part*, 453 F.2d 709, 721–22 (2d Cir.1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972), concluded that any exception to the *Blue Chip Stamps–Birnbaum* rule that there otherwise may be for private injunctive actions does not operate in favor of a target's management seeking to enjoin the activities of a tender offeror. *See John Labatt*, 890 F.Supp. at 247. Although the rationale behind these decisions—that entrenched management is self-interested rather than interested in protecting shareholder rights and therefore undeserving of an exception to the general rule of standing—may one day be extended to cases involving external competitors for corpo-

rate control, we have discovered no controlling authority that as yet has done so.

To be clear, we do not hold that DeBartolo had standing to seek an injunction; that issue is not before us. We hold only that, as an external competitor seeking only injunctive relief, DeBartolo arguably had standing under *Crane*. DeBartolo's assertion of standing in the district court therefore was not frivolous. Accordingly, the district court erred insofar as it relied on the fact that DeBartolo was neither a purchaser nor a seller with respect to the challenged transactions in concluding that appellants' 10b–5 claim was frivolous. We proceed therefore to consider the district court's alternative basis for its ruling.

### d. *Viability of Appellants' Rule 10b–5 Claim*

The district court found appellants' Rule 10b–5 claim to be frivolous not only because DeBartolo lacked standing to assert it, but also because the elements of the claim in any event were insufficiently alleged. *See Simon DeBartolo Group*, 985 F.Supp. at 433. The court did not elaborate, except to state that there was no fiduciary duty between the parties and that appellants' allegations of fraud were insufficient. *See id.* We hold that this conclusion also was erroneous.

### i. *Duty to Disclose or to Abstain*

▮▮▮▮▮ By placing particular emphasis on what it described as the lack of a "fiduciary relationship between the parties to the suit," *id.*, the district court may have meant that appellants insufficiently alleged the requisite duty of the defendants to disclose the inside information it held or to abstain from trading in RPT shares. Appellants were not obliged to demonstrate a fiduciary relationship between DeBartolo and the defendants in order to establish this duty, however. Under the traditional theory of insider trading, appellants merely were required to demonstrate a fiduciary or similar relation-

ship of trust and confidence between the defendants and RPT's shareholders generally. *See O'Hagan,* 521 U.S. at 652, 117 S.Ct. 2199; *Dirks,* 463 U.S. at 654–55, 103 S.Ct. 3255; *Chiarella,* 445 U.S. at 227–230, 100 S.Ct. 1108; *Chestman,* 947 F.2d at 565. Such a relationship may arise, as noted previously, where an outside party is given access to material non-public information by an issuer "solely for corporate purposes in the context of 'a special confidential relationship.'" *Chestman,* 947 F.2d at 565; *see also Dirks,* 463 U.S. at 655 n. 14, 103 S.Ct. 3255. Appellants, by alleging that RPT provided the defendants and the other Grand Slam parties with material non-public information to be used confidentially and solely for purposes of formulating Project Grand Slam, appear to have placed the defendants squarely within this limited category of corporate outsiders subject to the prohibition on insider trading, as outlined in *Chestman* and *Dirks.* Appellants therefore at least arguably alleged facts sufficient to establish the requisite duty to disclose or to abstain.

### ii. *Materiality*

■ "Information is material if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Acito,* 47 F.3d at 52 (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). "The determination of materiality is a mixed question of law and fact that generally should be presented to a jury." *Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529, 538 (2d Cir.1999). "Only if no reasonable juror could determine that the undisclosed [information] would have assumed actual significance in the deliberations of the reasonable [investor] should materiality be determined as a matter of law." *Id.* (second alteration in original; internal quotation marks omitted).

Appellants alleged that RPT provided the defendants with material, non-public information to help them formulate Project Grand Slam. Appellants explained that, although they did not yet know the actual content of this information, they believed—accurately, as it turned out—that it consisted of information such as "rent roles [*sic* ], lease provisions, site plans, and other information typically utilized and relied upon by real estate professionals in evaluating properties such as those owned by RPT." Appellants also stated that when DeBartolo sought the same information, it was rebuffed.

Given the nature of the undisclosed information and the limited facts available to appellants at the time they filed suit, we cannot conclude that they had insufficient basis to assert materiality. In light of the mixed legal-factual nature of this element and the district court's failure to make a particular finding on this point, we cannot conclude that the materiality element of appellants' 10b–5 claim was defective enough to warrant a finding by the district court that the Rule 10b–5 claim was frivolous in this respect.

### iii. *Scienter*

■ In order to plead scienter sufficiently, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the [requisite intent]." *Press,* 166 F.3d at 538 (quoting 15 U.S.C. § 78u–4(b)(2)) (internal quotation marks omitted). This includes the "intent 'to deceive, manipulate, or defraud,' or knowing misconduct." *Id.* (quoting *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1467 (2d Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997)). Here, appellants made a non-frivolous assertion of scienter by alleging that the defendants traded while knowing they were in possession of material inside information. Indeed, the defendants acknowledge that they knowingly traded on inside information, contesting only materiality and the legal implications of such knowl-

edge. The scienter element therefore provides no ground for concluding that appellants' 10b–5 claim was frivolous.

#### iv. *Reliance*

 Where a Rule 10b–5 claim depends upon an allegation of misrepresentation, the plaintiff has the burden of pleading and proving reasonable reliance. *See, e.g., Harsco Corp. v. Segui,* 91 F.3d 337, 342 (2d Cir.1996). Where the claim rests on an omission, however, reliance may be presumed upon a showing that the omitted information was material. *See Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). This rule applies in the context of an insider trading claim. *See, e.g., Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228, 240 (2d Cir. 1974) (holding that *"Affiliated Ute* surely warrants our conclusion that the requisite element of causation in fact has been established by the admitted withholding by defendants of material inside information which they were under an obligation to disclose, such information being clearly material in the sense that ... reasonable investors might have considered it important in making their decision to purchase Douglas stock."). Because we have found that appellants' allegations of materiality were not frivolous, it follows that appellants were entitled under *Affiliated Ute* to a presumption of reliance.

 The defendants argue that appellants' Rule 10b–5 claim nonetheless was frivolous because the defendants explicitly disclosed, in their agreements for the purchase of RPT stock pursuant to Project Triple Play, that they possessed non-public information about RPT. This argument raises the interesting question of whether the possessor of inside information may trade on the information without liability under Rule 10b–5 provided he or she first discloses to the seller or purchaser not the inside information itself, but the fact that he or she possesses it. However interesting the issue, we need not reach it

here. Whatever the implications of the disclosures in the defendants' purchase agreements for the prospects of appellants' success on their Rule 10b–5 claim, the defendants have directed us to nothing in the record, nor have we found anything there ourselves, to suggest that appellants knew or should have known of the disclosures to the shareholders at the time appellants made that claim. Even if the disclosures did bar a Rule 10b–5 claim, appellants' reasonable ignorance of the disclosures rendered the claim non-frivolous.

#### v. *Injury*

 Finally, although appellants requested injunctive relief only and not monetary damages, they were nonetheless required to demonstrate an injury of some sort in order to sustain their Rule 10b–5 claim. *See Packer,* 630 F.Supp. at 1241 (dismissing shareholder suit against board of directors for failure to allege injury). As noted previously, the complaint alleged that DeBartolo was injured in two respects: (1) as a shareholder, it was harmed because the defendants' actions tended to preclude all shareholders from obtaining the best price for their RPT shares, and (2) as a competitor for control, DeBartolo was harmed because the defendants' actions tended to preclude DeBartolo from presenting its competing bid on a level playing field. Only the latter allegation is relevant here, however, because DeBartolo's standing to assert this claim in the first place depends upon its status as a tender offeror and not its status as a shareholder.

 The injury issue, therefore, is whether appellants' claim that the defendants' alleged insider trading harmed De-Bartolo by tending to defeat its tender offer was plausible. It was. The defendants' failure to disclose the inside information they possessed may have enabled them to purchase RPT shares in an amount and at a price that they otherwise could not or would not have, resulting in

fewer available shares when DeBartolo subsequently launched its tender offer, and making that offer less likely to succeed. Whatever the ultimate merits of the argument, this potential harm takes appellants' injury allegation out of the realm of frivolousness.

Because there were non-frivolous allegations and arguments supporting each element of appellants' Rule 10b–5 cause of action and DeBartolo arguably had standing to assert the claim, we are compelled to conclude that the district court abused its discretion in determining that the claim was frivolous.

## 2. *Appellants' Rule 10b–13 Cause of Action*

The next question is whether the district court acted within its discretion in determining that appellants' Rule 10b–13 cause of action was frivolous.

### a. *Rule 10b–13*

SEC Rule 10b–13, promulgated pursuant to the SEC's authority under §§ 10(b), 13(e), 14(e), and 23(a) of the Exchange Act, *see* 17 C.F.R. § 240.10b–13; Adoption of Rule 10b–13 Under the Securities Exchange Act of 1934, Exchange Act Release No. 34–8712, [1969–1970 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 77,745, at 83,-709 (Oct. 8, 1969), states in relevant part:

> No person who makes a cash tender offer or exchange offer for any equity security shall, directly or indirectly, purchase, or make any arrangement to purchase, any such security (or any other security which is immediately convertible into or exchangeable for such security), otherwise than pursuant to such tender offer or exchange offer, from the time such tender offer or exchange offer is publicly announced or otherwise made known by such person to holders of the security to be acquired until the expiration of the period, including any extensions thereof, during which securities tendered pursuant to such tender offer

> or exchange offer may by the terms of such offer be accepted or rejected....

17 C.F.R. § 240.10b–13(a). The rule thus "prohibits a person making a cash tender offer or exchange offer for any equity security ... from buying or arranging to buy any such security ... outside the tender or exchange offer—a practice sometimes called buying 'alongside' the tender offer." Loss & Seligman, Fundamentals of Securities Regulation at 526 (emphasis deleted).

### b. *The Opinion Below*

In bringing a Rule 10b–13 cause of action against the defendants, appellants argued in substance that Project Grand Slam amounted to a tender offer, albeit an unorthodox one, and that the defendants' purchases of RPT shares prior to the RPT shareholder vote on Project Grand Slam constituted buying alongside that offer. The district court branded this claim frivolous for two reasons. *See Simon DeBartolo Group*, 985 F.Supp. at 431–33. First, the court concluded that appellants' "argument that Project Grand Slam was a cognizable tender offer and thus within the purview of Rule 10b–13 was wholly without merit." *Id.* at 431. The court took the view that Project Grand Slam constituted an asset merger and, as such, could not be construed as a tender offer. *See id.* at 432 (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 779 (2d Cir.1991); *West Shore Fuel, Inc. v. United States*, 598 F.2d 1236, 1242–43 (2d Cir.1979); *Beaumont v. American Can Co.*, 621 F.Supp. 484, 500–01 (S.D.N.Y.1985), *aff'd*, 797 F.2d 79 (2d Cir. 1986)). The district court's second rationale for its decision was that, even assuming Project Grand Slam was a tender offer, Rule 10b–13 did not provide a private right of action in this instance. *See id.* at 432–33.

### c. *The Scope of the Tender Offer Concept Under Rule 10b–13*

██ We conclude in light of the clear language of Rule 10b–13 that the district court was well within its discretion in de-

termining that Project Grand Slam was not arguably a tender offer within the scope of that rule. Accordingly, we affirm the district court's conclusion that appellants' Rule 10b–13 cause of action was frivolous.

In *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47 (2d Cir.1985), as appellants remind us, we took a flexible approach to defining tender and exchange offers. *See id.* at 57. We indicated that in determining whether a solicitation constitutes such an offer, we look to the statute's or rule's purpose and the needs of the persons affected by the conduct at issue. And we agree with appellants that what they call the "policies and concerns" of Rule 10b–13 are important. But neither flexibility nor consideration of "policies and concerns" leaves us free to ignore the plain language of the rule.

Rule 10b–13 is specific enough: Its prohibition against buying "alongside" arises only in the context of a "cash tender offer or exchange offer for any equity security." 17 C.F.R. § 240.10b–13(a). Whatever else might be said of Project Grand Slam, it did not contemplate the acquisition of RPT equity by the defendants, was not an offer for "any equity security," and hence was not subject to Rule 10b–13.

The object of Project Grand Slam was the defendants' co-ownership with others, including RPT's former shareholders, of the new REIT, which in turn would own, among other things, RPT's former assets. No matter how RPT shareholders voted on Project Grand Slam, and whether or not Project Grand Slam was approved or came to fruition, the project did not contemplate and could not have resulted in the defendants' ownership of those shareholders' RPT shares. Since Project Grand Slam could not result in the defendants' ownership of those equity securities, it could not have been an offer—direct or indirect, orthodox or unorthodox—for those equity

securities coming within the scope of Rule 10b–13, which by its terms applies only to "offer[s] for any equity security."

Appellants contend to the contrary that Project Grand Slam triggered Rule 10b–13's protections because, in substance if not in form, it amounted to an exchange offer by the defendants for RPT's equity. They explain that "[a]ll of RPT's investors were being solicited to vote on a transaction in which, as a matter of economic reality, they would effectively exchange their shares of RPT for shares of a newly formed REIT." While this may accurately depict the long-term consequences of Project Grand Slam from the perspective of those shareholders, it does not alter the fact that at no point would the defendants acquire RPT equity under Project Grand Slam. The plan therefore could not have been a tender or exchange offer governed by Rule 10b–13.

Rule 10b–13 applies only if there is some identity between the security purchased "alongside" the tender or exchange offer and the security acquired pursuant to the tender or exchange offer itself. Here the purchases alleged to have been made "alongside" were the RPT shares bought by the defendants in individual transactions pursuant to Project Triple Play.[7] Project Grand Slam, by contrast, was not a tender or exchange offer for RPT shares. The identity of shares tendered for and shares purchased "alongside" required by Rule 10b–13 was therefore absent.

The decisions relied upon by appellants, *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 596–97 (5th Cir.) (letter to shareholders implementing the cash-option aspect of a merger constituted the announcement of a tender offer), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974), *Zuckerman v. Franz*, 573 F.Supp. 351, 357–58 (S.D.Fla.1983) (cash merger proposal constituted a tender offer), and *Iavarone v.*

---

7. Appellants did not allege in their complaint and do not assert on appeal that the defendants' purchases of RPT shares pursuant to

Project Triple Play were made pursuant to a tender or exchange offer.

*Raymond Keyes Associates, Inc.*, 733 F.Supp. 727, 732–33 (S.D.N.Y.1990) (issuer's stock reorganization plan, pursuant to which shareholders would exchange existing shares of common stock for newly issued preferred stock, constituted a tender offer), are not to the contrary. Although each of these decisions concluded that an unconventional tender offer had been made, in each case the offer would or did actually result in the defendant's acquisition of equity securities in the target entity. *See Smallwood*, 489 F.2d at 586–87, 596–99; *Zuckerman*, 573 F.Supp. at 358; *Iavarone*, 733 F.Supp. at 729–30. The defendants' actions in these cases, in contrast with Project Grand Slam, could therefore be characterized as offers for equity securities under Rule 10b–13.

Appellants also cite *SEC v. Texas International Co.*, 498 F.Supp. 1231 (N.D.Ill. 1980). That decision concerned a reorganization plan for a bankrupt corporation pursuant to which certain outstanding claims against the debtor's estate would be discharged via the distribution of stock in the reorganized entity to the creditors. *See id.* at 1236–37. Citing the convertibility of the claims against the estate into equity, the district court concluded that the defendant's offer to purchase these claims amounted to a tender offer. *See id.* at 1239–40. The claims purchased by the defendant in *Texas International* were not unlike warrants for shares in the newly reorganized entity, being literally convertible into stock at the owner's election. Having made an offer for rights convertible into shares, the defendants, if successful, would have owned the shares. The offer thus could properly be viewed as an offer for equity securities, albeit an indirect one.

Had Project Grand Slam involved an offer for rights, warrants or any other instruments convertible into equity securities of RPT, we might also be able to conclude that it may have been the equivalent of "a cash tender offer or exchange offer for [that] equity security." But nothing in Project Grand Slam was equivalent to an offer for RPT shares or any other equity security. Rule 10b–13 therefore does not apply.

Accordingly, the district court acted entirely within its discretion in determining that it was frivolous for appellants to assert that Project Grand Slam was a tender offer subject to regulation by Rule 10b–13. We affirm this aspect of the district court's decision without reaching the alternative rationales stated in the opinion below.

**B.** *Fed.R.Civ.P. 11(b)(1)—Whether the District Court Correctly Determined that Appellants Filed Suit for an Improper Purpose*

■ After concluding that appellants had brought frivolous claims in violation of Rule 11(b)(2), the district court considered whether the complaint had been brought for an improper purpose in violation of Rule 11(b)(1). This inquiry was significant because, unlike a violation of Rule 11(b)(2), a violation of Rule 11(b)(1) would warrant the imposition of monetary sanctions not only on DeBartolo's counsel but also on DeBartolo itself. In resolving the question of improper purpose against the appellants, however, the court simply referred back to the question of frivolousness it had just decided: "The utter frivolity of [DeBartolo]'s claims and their failure to offer reasonable justification as to why either Rule 10b–13 or Rule 10b–5 should be extended, modified, or reversed on their behalf indicates that [DeBartolo] abused the judicial process in its attempt to thwart the Defendants' Project Grand Slam proposal." *Simon DeBartolo Group*, 985 F.Supp. at 433. The district court gave no other explanation for its conclusion that appellants violated Rule 11(b)(1). As a consequence of this determination, DeBartolo shared jointly with its counsel liability for the $100,000 penalty imposed by the court. *See id.* at 434.

■ The explanation offered by the district court indicates that the court sanctioned both DeBartolo and its lawyers for

violating Rule 11(b)(1) on the ground that DeBartolo's lawyers had violated Rule 11(b)(2). Permitting a Rule 11(b)(1) determination to turn entirely on a Rule 11(b)(2) violation would, however, render a client responsible for the frivolous claims asserted by its attorneys, contrary to Rule 11(c)(2)(A)'s explicit prohibition. The district court's decision in that regard was an abuse of discretion and must therefore be reversed.

## III. Recalculation of Sanctions

There is often a significant difference between a wholly unwarranted lawsuit and a single unwarranted claim included in an otherwise non-frivolous lawsuit. The former requires the court and one or more defendants to incur all the unnecessary expenditure of time and needless economic, emotional and other costs associated with engaging in litigation. The impact of the wrongful initiation of litigation calls to mind Judge Learned Hand's oft-quoted dictum that a lawsuit should be "dread[ed] ... beyond almost anything else short of sickness and death." Learned Hand, *The Deficiencies of Trials to Reach the Heart of the Matter*, 3 Ass'n of the Bar of the City of New York, *Lectures on Legal Topics* 89, 105 (1926), *quoted in Schmieder v. Hall*, 545 F.2d 768, 768 (2d Cir.1976), *cert. denied*, 430 U.S. 955, 97 S.Ct. 1601, 51 L.Ed.2d 805 (1977).

██ By contrast, the commonplace if unfortunate practice of pleading a groundless claim together with legitimate ones is, typically, more of an inconvenience than a catastrophe—both for the opposing party who must merely demonstrate why the claim is not viable, and for the court that must so decide. While we hardly countenance the filing of bogus claims among valid ones, there may thus be a considerable difference for Rule 11 purposes between an entirely frivolous complaint and a complaint including both "doubtful" counts and counts of "reasonable merit." *See Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 97 (3d Cir.1988); *cf. McCann v.*

*Coughlin*, 698 F.2d 112, 129 (2d Cir.1983) (in § 1983 context, court considering reduction of attorneys' fees award for prevailing party on ground that plaintiff succeeded on some but not all claims should bear in mind tension between discouraging "kitchen sink" complaints and encouraging the assertion of potentially viable claims).

In the ordinary case, a district court that would sanction a plaintiff for filing a baseless complaint might, in the exercise of its discretion, refrain from sanctioning the same plaintiff for filing a similar complaint containing, amongst viable claims, a baseless one. For that reason, were this an ordinary case, we would likely remand it to the district court for a determination as to whether it will persist in its decision to impose sanctions at all, and only if so for a determination of what those reconsidered sanctions should be. *Cf. O'Brien v. Alexander*, 101 F.3d 1479, 1492 (2d Cir. 1996) (finding that one of two representations for which counsel was sanctioned by the district court was sanctionable, but remanding the entire sanctions judgment "for the district court to reconsider *whether* and, in what amount, sanctions should nevertheless be imposed." (emphasis added)).

██ But this is not an ordinary case. Unlike the usual Rule 11 controversy in which, under the terms of the Rule, sanctions are discretionary, this one is governed by the PSLRA, which provides:

> If the court makes a finding under [the mandatory review provisions of the statute] that a party or attorney violated any requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint ... the court *shall* impose sanctions on such party or attorney in accordance with Rule 11 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u–4(c)(2) (emphasis added). We have upheld the district court's conclusion that DeBartolo's Rule 10b–13 claim was not "warranted by existing law or by a nonfrivolous argument for the extension,

178

modification, or reversal of existing law or the establishment of new law." Fed. R.Civ.P. 11(b)(2). Under the PSLRA, then, the district court was required to impose sanctions with respect to that claim.

We make these observations because, as we have already noted, the PSLRA establishes a rebuttable presumption that the appropriate sanction for a "substantial failure of any complaint to comply with any requirement of Rule 11(b) ... is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred in the action." 15 U.S.C. § 78u–4(c)(3)(A)(ii). We doubt that the statute meant for the district court to presume that when a *single claim* in an action is frivolous, the proper sanction is reasonable attorneys' fees and other expenses incurred in the *entire action*. Indeed, the district court may conclude on remand that the complaint did not substantially fail to comply with Rule 11(b) and therefore that the rebuttable presumption in favor of attorneys' fees is inapplicable. We therefore remand the case for the district court to determine whether a substantial failure to comply with Rule 11(b) occurred in this instance, and to impose an appropriate sanction against Gordon Altman in accordance with its finding. If the district court decides that monetary sanctions are still warranted, we note our understanding that the proper level of an award for the firm's assertion of a frivolous claim is likely to be substantially less than was the level of sanctions the court actually awarded on the basis of what we now hold to be its mistaken conclusion that the action was frivolous in its entirety.

Finally, for the reasons spelled out above, no monetary sanction is warranted against appellant DeBartolo.

## CONCLUSION

For the foregoing reasons, we reverse the decision of the district court that appellants' Rule 10b–5 claim was frivolous under Rule 11(b)(2) and that the suit was filed for an improper purpose under Rule 11(b)(1). We affirm, however, the district court's holding that appellants' Rule 10b–13 claim violated Rule 11(b)(2). We remand for a redetermination of sanctions— to be imposed only on Gordon Altman.