Sack,* Circuit Judge,
dissenting in part:
A plaintiff brings a slander per se claim against a co-worker, and that claim is defeated on summary judgment. On review, an appellate court holds that the claim should have survived the defendant’s motion for summary judgment notwithstanding that the plaintiff adduced no direct evidence even suggesting that the defendant made the allegedly defamatory statement: the defendant denied making it; the individual who reported the statement said that she heard it from “several” individuals without identifying the defendant as one of those multiple speakers; and no witness testified that the defendant was the source of the statement. That, as I see it, is the case at bar. Although I agree with the panel majority with respect to the remainder of this appeal, Memorandum Disposition (hereinafter “MD”) at 4-7, I respectfully dissent from its decision to return the case to the district court for trial of the defamation claim brought against defendant-appellee Raejohne Foster.
The plaintiff-appellant, Angela Cummings, was employed as a telemetry monitor technician at and by Valley Health System, LLC dba Desert Springs Hospital (“DSH”) between 2005 and 2013. Declaration of Angela Cummings (hereinafter “Cummings Dec.”) ¶ 7, Excerpts of the Record (hereinafter “ER”) Vol. II at 38. Telemetry monitor technicians work in a small space in teams of two, tracking dozens of panels that receive and display diagnostic information about patients’ heart health. Deposition of Angela Cummings (hereinafter “Cummings Dep.”) at 59-60, ER Vol. Ill at 16-17. Throughout her nearly eight-year tenure at DSH, Cummings was repeatedly issued “corrective actions”[1] and citations related to various workplace infractions. In 2011, for example, she was cited for being “very rude” toward a co-worker. DSH Corrective Action Report (Oct. 19, 2011), ER Vol. Ill at 151. In 2012, she was disciplined for violating DSH’s timekeeping policies. DSH Corrective Action Report (July 28, 2012), ER Vol. Ill at 166. The same year, a coworker reported that Cummings failed to report to the telemetry monitor room at the start of her shift, and when she did arrive she was “very rude, abrupt and insubordinate.” Ltr. from Beena Thomas to Jim Zolnowski (July 28, 2012), ER Vol. Ill at 196. It appears that Cummings occasionally clashed with her co-workers. Her 2007 performance review states that while Cummings “is a good monitor tech[nician] ... [,] she need[s] to be considerate of her coworkers. She does not consistently communicate with her peers.” Cummings Dep. at 65, ER Vol. Ill at 22.
In particular, Cummings had several disputes with the defendant-appellee, Rae-johne Foster, who was employed as a telemetry monitor technician by and at DSH *535 between 2004 and 2014. Deposition of Rae-johne Foster (hereinafter “Foster Dep.”) at 20, ER Vol. II at 123. In 2012, for example, Cummings reported that Foster had engaged in “repeated threats of violence, harassment and humiliation” against her dating back to 2010. Ltr. from Angela Cummings to DSH Human Resources (May 7, 2012), ER Vol. Ill at 153. DSH investigated but was unable to substantiate those allegations. DSH Human Resources Memorandum (June 5, 2012), ER Vol. Ill at 157. Foster conceded, however, that the two did not get along. See Foster Dep. at 23-24, ER Vol. II at 125. She recounted one incident, for example, when Cummings reported Foster for watching an internet video when Foster should have been monitoring telemetry panels. Id. at 31-32, ER Vol. II at 127. Foster estimated that, for her part, she reported Cummings for workplace infractions on five occasions. Id. at 37, ER Vol. II at 129.
The events at issue in this litigation relate to a particular series of disputes in late 2012 and early 2013. On or about December 1, 2012, Cummings was staffed to the telemetry monitor room with Joanne Ruiz, another telemetry monitor technician. Cummings Dec. ¶ 43, ER Vol. II at 43. During the Cummings-Ruiz shift, Foster entered the telemetry monitor room to converse with Ruiz and saw that Cummings was watching a video instead of the telemetry monitors. Id. Foster created a video recording of the incident—which was provided to DSH—and reported Cummings to her superiors. As a result of Foster sharing that information with management, on January 11, 2013, Cummings was placed on “investigative leave.” DSH Corrective Action Report (Jan. 11, 2013), ER Vol. Ill at 220.
The next day, January 12, another DSH employee, identified in the record only as “Diane,” reported to the DSH Security Department that “[s]he heard from several employees that [Cummings] ... had made a comment that if she gets fired she would come back and shoot up the place.” DSH Incident Report (Jan. 12, 2013), ER Vol. Ill at 222,[2] Nothing in the record—other than the rumors themselves—supports the assertion that Cummings made such a threat. In fact, according to Donna Adkins, then interim director of DSH critical care, Diane later indicated that she meant only to pose a “what if’ scenario. E-mail from Donna Adkins to Yomi Fabiyi (Jan. 15, 2013), ER Vol. Ill at 224. Nonetheless, “as an extra measure,” Adkins “change[dj the security door code to the [telemetry monitor] room.” Id.
More than a month later, on February 20, 2013, Cummings’ employment was terminated because she had repeatedly violated DSH policies. Ltr. from Yomi Fabiyi to Angela Cummings (Feb. 20, 2013), ER Vol. Ill at 238. Her termination was unrelated to the alleged- threatening statement attributed- to her. Cummings eventually filed a lawsuit against DSH and Foster, alleging, inter alia, that Foster defamed her by conveying to Diane the rumor that Cummings had threatened to “shoot up the place.” Compl. ¶¶ 72-84, ER Vol. II at 30-31. The United States District Court for the District of Nevada (Gordon, Judge) granted the defendants’ motion for summary judgment on all claims, deciding with respect to the slander per se claim that *536 recovery was barred by the intracorporate communication privilege.
I agree with the majority—although not without some reluctance, as explained below—that “Foster is not covered by the intracorporate communication privilege.” MD at 8. I do not agree, however, that Cummings adduced “enough circumstantial evidence from which a reasonable jury could conclude that Foster started the rumor.” Id. at 7. “[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.” Nelson v. Pima Cmty. Coll., 83 F.3d 1075, 1081-82 (9th Cir. 1996). And “[a] mere scintilla of evidence will not do, for a jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation.” British Airways Bd. v. Boeing Co., 585 F.2d 946, 952 (9th Cir. 1978).
“A defamation claim requires demonstrating (1) a false and defamatory statement of fact by the defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages.” Pope v. Motel 6, 121 Nev. 307, 315, 114 P.3d 277, 282 (2005) (emphasis added). Cummings presented no more than a “mere scintilla of evidence” supporting the notion that Foster made the allegedly defamatory statement reported by Diane. This evidence would, in my view, permit a reasonable jury to do little more than speculate that Foster made the allegedly defamatory statement, I would therefore affirm that part of the district court’s judgment granting Foster’s motion for summary judgment on the slander per se claim, albeit on different grounds from those employed by the district court.
No direct evidence links Foster to the allegedly defamatory statement. During her deposition, and while under oath, Foster herself denied spreading the rumor. Foster Dep. at 62-62, ER Vol. II at 135. The DSH incident report, the sole source for the parties’ assertions concerning Diane’s statement about the alleged rumor, indicates that Diane heard the rumor from “several employees,” but does not identify Foster as one of them. DSH Incident Report (Jan. 12, 2013), ER Vol. Ill at 222. Thus, the lone piece of direct evidence in this case as to the propagation of the rumor identified neither Foster nor any other particular employee as the speaker. A third employee stated in her sworn deposition that although she “assumed” that Foster spread the allegedly defamatory rumor, the employee “[did not] know if [Foster] did” in fact do so. Deposition of Synthia Armstrong at 53, ER Vol. II at 64 (emphases added). Indeed, of the many DSH employees, supervisors, and officers deposed in this case (Diane not among them), no one testified that Foster made the allegedly defamatory statement.
The majority nonetheless concludes that that “there is enough circumstantial evidence” connecting Foster to the allegedly defamatory statement on two grounds. MD at 7. First, the majority notes that Foster and Diane “worked together in the telemetry room” on January 12, 2013, the day Diane reported Cummings to the DSH security department. Id. at 8. I do not think that circumstance permits the inference—let alone supports the conclusion— that Diane heard the allegedly defamatory rumor about Cummings from Foster. Although it is possible that Foster told Diane the rumor while the two were together in the telemetry monitor room, it is also possible that Diane—whose testimony as to these events was never taken—heard the rumor while talking to a co-worker outside work, or while chatting on the phone in her car, or while texting from her living room. The possibilities are virtually endless. Some of these manifold possibilities *537 seem to me to be at least as likely as the inference drawn by the majority, in no small part because Diane, we are told, reported hearing the rumor from “several employees.” DSH Incident Report (Jan. 12, 2013), ER Vol. Ill at 222. Moreover, when Diane reported the alleged thereat on January 12, 2013, the day she was working with Foster, she apparently did not state that she first heard the rumor that day. Perhaps she instead heard the rumor the day before, when Cummings was placed on investigative leave, and decided only the next day to raise the issue. We do not know.
The majority further states that because Diane and Foster were the only telemetry monitor technicians assigned to the telemetry monitor room on January 12, 2013, they were “the only two employees in the telemetry room” on the day that Diane filed her report. MD at 8. I do not think that the record supports that inference. DSH employees were, more or less freely, permitted to enter and exit the telemetry room. DSH nurses delivered equipment to the telemetry room and would have had an opportunity to engage with the monitor technicians. Id. at 75, ER Vol. Ill at 30. And, of course, Cummings was ultimately terminated because Foster entered the telemetry monitor room to converse with Ruiz on a day that she was not staffed to that room, and in the process she saw Cummings failing to attend to the monitors. Cummings Dec. ¶ 21, ER Vol. II at 43, Moreover, telemetry monitor technicians were given multiple meal and restroom breaks throughout the day, during which they very likely interacted with other employees. Cummings Dep. at 115-18, ER Vol. Ill at 40-43. Thus, I do not think that a reasonable juror could conclude either that Diane necessarily interacted with only Foster on the day that Diane reported the Cummings rumor, or that Foster was the source of the allegedly defamatory statement based on this evidence.
Second, the majority reasons that the slander per se claim brought against Foster should survive summary judgment because “[Foster] and Cummings have had a contentious history.” MD at 8. That description of their relationship is surely accurate. But to infer from that and Foster’s history of “reporting] Cummings for several violations of company policy” that Foster spread the allegedly defamatory rumor—absent statements under oath or otherwise to that effect—seems to me to be no more than speculation. Id. at 8. Although Foster may have had a motive to spread the allegedly defamatory statement, it is also possible that others had a similar motive, especially in light of Cummings’ apparent unpopularity and questionable performance of her duties at DSH.[3] I am reluctant to conclude that Foster’s arguably far-from-unique motive to utter the statement in question—without testimony or other evidence that she in fact did so—sufficiently supports an inference of misconduct to require Foster to stand trial. And I am not at all convinced on the broader point: that motive alone would in the ordinary run of cases be sufficient to support a conclusion that a defendant published a defamatory falsehood.
The Nevada Supreme Court has stated that “circumstantial evidence may be used to prove that [a] defamatory statement was communicated to a third person when evidence is presented regarding the tone *538 in which the defamatory statement was made or the proximity of third parties.” Blanchard v. Circus Casinos, 127 Nev. 1119, 373 P.3d 896, 2011 WL 4337055, at *2 (Nev. 2011) (unpublished order of affir-mance) (internal quotation marks omitted). It has also suggested that a plaintiff might rely on “direct or circumstantial evidence of the communication of the defamatory statement to a third person.” M & R Inv. Co. v. Mandarino, 103 Nev. 711, 716, 748 P.2d 488, 491 (Nev. 1987). But there was no question in (Rose cases that the defendant made the allegedly defamatory statement; the issue in both was instead whether a statement that was admittedly made by a defendant was published to a third party. Id.; Blanchard, 127 Nev. 1119, 373 P.3d 896, 2011 WL 4337055 at *2. The Nevada Supreme Court has not, to the best of my knowledge, held, stated, or even suggested that a slander per se claim may proceed absent a modicum of direct evidence connecting the defendant to the making of the allegedly defamatory statement.
* * *
I have noted that I agree—albeit with some reluctance—with the majority’s conclusion that the district court erred by deciding that if Foster made the statements in issue, she enjoyed a privilege to do so. See Simpson v. Mars, Inc., 113 Nev. 188, 191, 929 P.2d 966, 968 (1997) (holding “that publication of defamatory material to anyone other than the person defamed, even to agents, is publication for the purpose of making a prima facie case of defamation”). I take a moment to express my concern as to possible unfortunate consequences of that conclusion.
The Department of Homeland Security has adopted as its own the familiar post-9/11 slogan: “If you see something, say something.”[4] The allegedly defamatory statement at issue in this appeal concerned threatened workplace violence by a recently suspended co-worker who may well have harbored a bitter grudge. If the headlines in the news media are to be believed, there is reason to fear that such violence has become alarmingly frequent. On the day that our panel heard argument in this appeal, for example, a former employee of a business in Orlando, Florida reportedly walked into his former workplace and shot and killed five employees, and then himself.[5] Did words of warning precede the Orlando carnage?
I fear that, after our decision today, at least in the context of potential workplace violence, the Department of Homeland Security motto may have to be amended to read: “If you see something say something—but be warned that if your understanding of what you saw or heard turns out to be false, you must be prepared to spend years defending yourself from a slander suit, and perhaps to suffer a money judgment at the end of the ordeal.”[6] *539 Might that deter someone from reporting a rumored or otherwise-suspected plan to carry out' a workplace shooting spree where the plan indeed turns out to be afoot? I can only hope not.
* * *
Because I can find nothing of substance in the record sufficiently connecting the defendant to utterance of the allegedly defamatory statement at issue, I conclude that the district court was right to dismiss the claim, even if on another basis than it used. Therefore and to that extent, I respectfully dissent.

 The Honorable Robert D. Sack, United States Circuit Judge for the Court of Appeals for the Second Circuit, sitting by designation.

. A "corrective action” is a DSH term for a plan to identify and rectify improper employee behavior.

. The only recordation of Diane’s statement is in an "incident report” that recounts Diane’s statement to the DSH Security Department regarding "threatening comments” attributed to Cummings in the incident report. DSH Incident Report (Jan. 12, 2013), ER Vol. Ill at 222. Diane’s deposition was not taken in connection with this litigation or the events underlying it.

. That the motives of other co-workers were neither alleged in the complaint nor unearthed during discovery does not help Cummings build her case against Foster. Indeed, it may instead reveal that Cummings aims to pin the rumor on Foster, her workplace adversary.

. If You See Something, Say Something, Def't of Homeland Security, https://www.dhs.gov/ see-something-say-something (last visited July 31, 2017).

. See David Harris et al., Orlando Workplace Shooting: Former Employee Kills 5, Then Himself, Orlando Sentinel (June 5, 2017), http:// www.orlandosentinel.com/news/orlando-workplace7shooting/os-orlando-workplace-shooting-20170605-stoiy.html; see also Chris-tal Hayes & Paul Brinkmann, Orlando Shooting Is Latest in Growing Trend of Workplace Violence, Expert Says, Orlando Sentinel (June 5, 2017), http://www.orlandosentinel.com/ news/orlando-workplace-shooting/os-orlando-workplace-shooting-violence-uptick-20170605-story.html (“There were 417 homicides at workplaces across the country in 2015, according to the [United States] Bureau of Labor Statistics.”).

. Cf. Learned Hand, The Deficiencies of Trials to Reach the Heart of the Matter, in Ass’n of the Bar of the City of New York, 3 Lectures on Legal Topics 89, 105 (1926) (musing a lawsuit *539 should be "dread[ed] ... beyond almost anything else short of sickness and death”), quoted in Simon DeBartolo Grp., L.P. v. The Richard E. Jacobs Grp., Inc., 186 F.3d 157, 177 (2d Cir. 1999).